## BEERS *v.* SHARPE.

[75 Pac. 717.]

Waters—Evidence of Agreement.

1. The evidence herein shows that plaintiff's predecessor in title had made an agreement with defendant's predecessors in title to aid in the construction and maintenance of a dam, in consideration of which he was to have a portion of the water.

Right of Cotenant to Dispose of Joint Property.

2. A cotenant, in the absence of special authority, cannot transfer any greater interest in an appropriation of water for irrigating purposes appurtenant to the estate than is commensurate with his own interest.

Notice to Cotenant of Adverse Claim.

3. Under the circumstances of this case the rule applies that presumably a continued use of joint property by one cotenant is in maintenance of the right of the other owners.

A lower proprietor agreed with a cotenant of an upper estate that in consideration of helping to build and maintain a dam he should have a certain water right for irrigating purposes. The cotenant filed a notice of his claim in the public records, but did not state therein the quantity of water he intended to appropriate. He subsequently testified that the notice was given to preserve his rights against a third person, and it also appeared that after the notice was filed another of the cotenants diverted water from the stream without objection. *Held*, that the notice was not notice to such cotenant and his successors in title of an adverse claim by the lower proprietor.

Example of a Use not Adverse.

4. The use by a lower proprietor of water after it has passed the upper proprietor's boundary is not adverse to the upper proprietor, so as to lay the basis for a claim by adverse user.

Intent and Extent of Appropriation.

5. The evidence here is not satisfactory either as to the intent of the original appropriator, or as to the diligence used in applying the water to a beneficial use beyond a certain point, in consequence of which the use, as against subsequent appropriators, must be confined to the area shown to have been contemplated by the original appropriator.

Necessity of Using Purchased Water.

6. The rule that an appropriator of water must put it to some beneficial use within a reasonable time, as against others desiring to use it, does not apply to purchased water, or water obtained under a contract with its owner, for then no one else can have adverse rights.

From Malheur: Morton D. Clifford, Judge.

This is a suit by W. P. Beers and another against I. W. Sharpe to enjoin interference with the flow of water in a slough in excess of a given quantity. The averments of the complaint, so far as deemed material, are, in substance, that plaintiffs own in severalty 1,760 acres of arid land in

Harney County, through which Jordan Creek flows, and a slough connected therewith extends; that in 1874 they entered into an agreement with defendant's predecessors, stipulating to aid in enlarging a dam in the creek and to keep it in repair for the exclusive right to use all the water diverted into the slough in excess of 150 inches theretofore appropriated; that they performed their part of the agreement, and, under a claim of right, have for twenty-seven years adversely used all the water in the slough in excess of 150 inches in irrigating 1,000 acres of their land now in cultivation, requiring 2,000 inches for that purpose; and that in May, 1901, the defendant unlawfully built a dam in the slough, obstructing the flow of water to their premises, and threatens, and unless restrained will continue, to maintain it. The answer denied the material allegations of the complaint, and for a separate defense averred that in 1870 the defendant's predecessors in interest settled on, cleared, and cultivated 600 acres of arid land above plaintiffs', and with the predecessors in interest of one George Clinton, who owns 1,200 acres lying between the premises of plaintiffs and defendant, built a dam in the creek, diverting into the slough 2,000 inches of water, which they (Clinton and defendant) have ever since used in irrigating their lands, the surplus flowing to plaintiffs' premises; that such appropriation was prior in time and superior in right to all others; and that in May, 1901, plaintiffs unlawfully removed defendant's dam, and prevented him from irrigating a part of his crops. The reply denied the allegations of new matter in the answer, and averred that defendant ought not to be permitted to disavow plaintiffs' right, for that he secured a title to his land with knowledge of their claim to the exclusive use of the water in the slough by reason of their work upon the dam and expense incurred in the cultivation of land while relying upon the faith of the agreement entered into with his

predecessors. The cause was referred, and, from the testimony taken, the court found that the defendant and Clinton owned the exclusive right to use all the water in the slough, and that plaintiffs had no interest therein, except to the use of the surplus when permitted to flow to their premises, and, a decree having been rendered dismissing the suit, they appeal. The case was submitted on briefs under Rule 16.                              AFFIRMED.

For appellants there was a brief over the name of *Will R. King.*

For respondent there was a brief over the names of *John L. Rand* and *Lionel R. Webster.*

MR. CHIEF JUSTICE MOORE, after stating the facts in the foregoing terms, delivered the opinion of the court.

It is contended by plaintiffs' counsel that the testimony shows that his clients and the defendant are tenants in common of the dam in Jordan Creek, the headgate, and the water right to the dam first built in the slough, below which they possess the exclusive right and are the prior appropriators of all the water turned into the slough in excess of 150 inches, and that the court erred in dismissing the suit and in not granting the relief prayed for in the complaint.

1. The transcript shows that in the fall of 1868 Sherman J. Castle, Fred Isabel, and C. D. Bacheler settled on unsurveyed public land, which they called "Goose Ranch," bordering for about two miles on the right bank of Jordan Creek, a natural stream that rises in Idaho, flows westward in a well-defined channel, and empties into the Owyhee River in Oregon. Bacheler claimed an undivided one-half interest in the land, and Isabel and Castle each an undivided one-fourth, but Isabel having transferred his interest to Castle, and Bacheler an undivided one-fourth to G. H. Tracey, they, in 1873, built a dam in the creek, which,

raising the water more than seven feet, caused about 2,000 inches thereof to flow into a slough, or old north channel, in which they placed a dam about 400 yards from its head and dug a ditch on the south side, diverting water, which they used in irrigating grain grown near the creek on their ranch. In 1869 O. W. Inskeep settled on similar land at the mouth of Cow Creek, a northern tributary of Jordan Creek, calling the premises "Ruby Ranch," about four miles below the dam in the latter stream, and on June 13, 1874, transferred his possessory right to the plaintiff, W. P. Beers, who, after the land was surveyed in 1875, filed a homestead on 160 acres in the center of section 16, township 30, south of range 44 east of the Willamette Meridian. The plaintiffs also secured from various sources the title to the remainder of section 16, and all of sections 15 and 22, in that township and range, except 160 acres in the latter section on the south side of the creek, which they own in severalty. Castle and one E. H. Clinton, having succeeded to the rights of the other claimants, became equal owners of Goose Ranch, and, in partitioning the land after it was survered, filed homesteads thereon, the former taking the west half of the southwest quarter, the southeast quarter of the southwest quarter, and the southwest quarter of the southeast quarter of section 24, and the latter the north half of the northeast quarter and the north half of the northwest quarter of section 26, in that township and range, through which Jordan Creek flows, and, having made proof of their continued residence on and cultivation of these lands, patents therefor were issued to each respectively. Castle also filed on and secured a receiver's receipt, under the desert act, for the north half, the north half of the southeast quarter, and the northeast quarter of the southwest quarter of section 24 in that township and range, and, having died, his widow, as his heir, on March 7, 1896, executed to the defendant a

deed to all of section 24, except 40 acres in the southeast corner. The defendant repaired a dam built in the slough near the northwest corner of his land, and diverted water, which he used in irrigating crops, when the plaintiff, W. P. Beers, in May, 1901, removed the obstruction, which being rebuilt, this suit was instituted.

Beers, as a witness in his own behalf, testified that in the fall of 1874 he entered into a contract with Bacheler, who was the manager of Goose Ranch, whereby it was stipulated that in consideration of his helping to keep the dam in Jordan Creek in repair he was to have the use of all the water flowing in the slough in excess of the quantity required to fill an irrigating ditch on that ranch, which did not exceed 200 inches, and that Castle knew of this agreement; that every year thereafter he paid one-third of the cost of the labor and material required to maintain the dam and the head gate built in the slough, and had claimed and used 1,000 inches of water in irrigating land, his right thereto never having been controverted until May, 1901, when the defendant placed a dam in the slough, thereby impeding the flow of water therein.

C. D. Bacheler, who, with his associates, built the dam in Jordan Creek, as plaintiffs' witness testified that they turned water into the slough and used it in irrigating grain, cultivating in 1874 more than than 100 acres; that until 1878, when he left Goose Ranch, no water was ever used except on grain land; that he entered into an agreement with Beers whereby he was to have the water that went over the dam near the head of the slough during the time he helped to maintain the dam in the creek; that the witness and his associates never claimed the use of any water, except such as was conducted in their ditch, and had no use for the overflow; that Castle never objected to his agreement with Beers; and that Tracy assigned his interest in Goose Ranch to the witness, who, after the land

was surveyed, transferred to S. Skinner and E. H. Clinton an undivided half of the water right and all his interest in the premises, describing the land which Clinton filed on as a homestead.

Henry Scoubes, as plaintiffs' witness, testified that he was working on Ruby Ranch when it was purchased by Beers, by whom he was employed until October, 1876; that he heard Bacheler tell Beers that if he would help repair the dam in Jordan Creek he should have a share of the water, saying they would form a partnership and divide it between them. The testimony discloses that a dam and head gate were built in the slough near its upper end, to regulate the flow of water therein, and that Beers paid a part of the expense incurred in its construction, and also helped to maintain the dam in the creek, repairs to which were frequently rendered necessary by freshets.

G. H. Tracy, as defendant's witness, testified that he was one of the claimants of Goose Ranch, and resided thereon from 1872 to the spring of 1875, when he transferred his interest to Bacheler; that no arrangements were ever made, to his knowledge, with Beers, whereby he was to have the use of any water; that in his absence his interests in the ranch were represented by Bacheler, who had no authority to sell the place or to dispose of any interest therein; that Castle represented his own half; and that Inskeep never had any interest in the dam. The witness states, however, that no claim was made to any water except such as was conducted in their ditch.

O. W. Inskeep's deposition is to the effect that he never considered he had any interest in the dam in Jordan Creek, though he worked thereon several days under an agreement that, in consideration of such labor, he was to have the surplus water, but the dam leaked to such an extent that no water ever reached Ruby Ranch through the slough

when needed, and he never used any in irrigating crops grown on the premises.

The foregoing is a brief synopsis of the testimony tending to establish the plaintiffs' right, from which we think it conclusively appears that Bacheler contracted with Beers to allow him the use of surplus water in the slough in consideration of his aid in maintaining the dam in Jordan Creek, and that he performed his part of the agreement. Bacheler, in speaking of the manner of diverting the water into the slough and the difficulty experienced in doing so, said : " It was a long time before we got the dam to stand." The defendant, estimating the expense of turning the water into the old channel, testified as follows : " I suppose a person could put in the dam, the work, the rock, maybe for $600 or $700 ; and it might cost more to go right at it to work." The cost of constructing and maintaining the dam and head gate, the volume of water that could be diverted into the slough, the plaintiffs' need thereof for irrigation, the labor performed and the money expended by them in keeping up the repairs, and the fact that a similar agreement was entered into with Inskeep, are circumstances which seem to confirm the conclusion that Beers entered into an agreement with Bacheler in respect to the use of surplus water in the slough.

2. Beers does not base his original right to the use of water from the slough on any agreement entered into with Castle, but on Bachelers's implied authority to grant such privilege on his behalf. In 1874, when Beers entered into the contract relied on, Castle possessed an undivided one-half and Tracy and Bacheler each an undivided one-fourth interest in Goose Ranch, the water appropriated thereon, and the right in the slough appurtenant thereto, and though they had only a possessory right to the property they were tenants in common thereof: Freeman, Cotenancy, (2 ed) § 88; Kinney, Irrigation, § 301; Long, Irri-

gation, § 75. Bacheler could not, therefore, without special authority from his cotenants, which has not been established, transfer any greater interest than he possessed, or more than an undivided one-fourth : *Person* v. *Wilson*, 25 Minn. 189; *Thompson* v. *Bowman*, 73 U. S. (6 Wall.) 316.

3. Assuming, without deciding, that the parol agreement conveyed an estate in the old channel and transferred a right to use water flowing therein, constituting Beers a tenant in common, was his use of the water from the slough for twenty-seven years adverse to the defendant, so that he now possesses a greater right than he originally secured? The continued use of the water by plaintiffs is presumed to be in maintenance of the right of the defendant, for whom they held it as tenants in common : *Moss* v. *Rose*, 27 Or. 595 (41 Pac. 666, 50 Am. St. Rep. 743). Beers filed in Baker County, which then included Ruby Ranch, the following notice :

"Jordan Creek, Jordan Valley, Baker County, Oregon,
                                December 10th, 1877.
To all whom it may concern :

This is to certify that I, W. P. Beers, claim (as successor by purchase of Oliver W. Inskeep) a water right for irrigating and other purposes. Said water is taken out of Jordan Creek at a dam on said creek, about five miles more or less above the mouth of Cow Creek, and conveyed through ditches and a slough a distance of about four miles on the north side of said creek, to section 16, township 30, south of range 44, east of the Willamette Meridian, all in the aforesaid county and State. The aforesaid dam and ditches were constructed by Oliver W. Inskeep and others and the water has been used by said Inskeep and myself for six or eight years, for irrigating purposes.
                                W. P. BEERS."

It will be observed that this announcement does not pretend to describe the quantity of water intended to be appropriated, and for that reason it could not of itself

impart notice to the defendant of Beers' intention to claim
the use of all the water in the slough. This deduction is
strengthened by Beers' testimony to the effect that the
notice was given to preserve his rights from invasion by
one Leslie, who then contemplated the appropriation of
some of the water, and it is quite evident that it was not
intended to limit or restrict the defendant's use of water
from the slough, which conclusion seems to be confirmed
by the fact that, after the notice was filed, Castle, without
objection from plaintiffs, built a dam in the slough and
diverted water therefrom, which he used in irrigating a
crop of barley and potatoes.

4. Before possession lawfully taken by a cotenant can
become adverse to the parties jointly interested in the
property, so as to set in motion the statute of limitations,
there must be an actual ouster and notice or knowledge
of the hostile intention in pursuance of which the exclu-
sive possession has been held: *Northrop* v. *Marquam*, 16
Or. 173 (18 Pac. 449); *Morrill* v. *Morrill*, 20 Or. 96 (25
Pac. 362, 11 L. R. A. 155, 23 Am. St. Rep. 95); *Wheeler* v.
*Taylor*, 32 Or. 421 (52 Pac. 183, 67 Am. St. Rep. 540). The
water flows in the slough through defendant's premises,
and thence across Clinton's land to that of the plaintiffs,
whose use thereof for irrigation, after it has passed the
defendant's western boundary, is not such an overt act as
to constitute an ouster, or sufficient to impart notice of a
hostile intention to assert a right by prescription, because
the defendant sustained no injury in such use: *Wimer*
v. *Simmons*, 27 Or. 1 (39 Pac. 6, 50 Am. St. Rep. 685);
*North Powder M. Co.* v. *Coughanour*, 34 Or. 9 (54 Pac. 223);
*Bowman* v. *Bowman*, 35 Or. 279 (57 Pac. 546). If plaintiffs'
diversion had been above the defendant's, their exclusive
use of the water might have presented a very different
question, but, being below, we do not think the evidence
of their use sufficient to set the statute of limitations in

motion. An examination of the testimony convinces us that Inskeep never initiated such a right to the use of water as would permit it to pass as an appurtenant under his deed to Beers.

5. The rule is settled in this State that to constitute a valid appropriation of water there must be (1) an intent to apply it to some beneficial use, existing at the time or contemplated in the future ; (2) a diversion thereof from a natural stream; and (3) an application of it within a reasonable time to some useful industry : *Simmons* v. *Winters*, 21 Or. 35 (27 Pac. 7, 28 Am. St. Rep. 727); *Hindman* v. *Rizor*, 21 Or. 112 (27 Pac. 13); *Low* v. *Rizor*, 25 Or. 551 (37 Pac. 82); *Nevada Ditch Co.* v. *Bennett*, 30 Or. 59 (45 Pac. 472, 60 Am. St. Rep. 777). If the method thus adopted be applicable to the case at bar, it is doubtful if Castle, the defendant's predecessor in interest, contemplated, at the time the water was diverted into the slough, using it for the irrigation of any land other than that lying along the creek, and thereafter included in his homestead ; but if, at the time of the original diversion, he intended to use the water on the land embraced in his desert entry, it is quite probable that the appropriation was not made thereon within a reasonable time. It will be remembered that in 1873 water was diverted from the slough by means of a dam and ditch, and used in irrigating grain grown on land now included in the homesteads of Castle and Clinton, and that Bacheler and Tracy respectively testified that no claim was ever made to the use of any water except such as was conducted in their ditch. These witnesses were undoubtedly able to testify in relation to their contemplated use of the water at the time they made the prior appropriation ; but they do not attempt to express Castle's intention in respect thereto, nor do we think their testimony shows them qualified to speak for him on that subject. The transcript shows that Castle made final proof in sup-

port of his desert entry and secured a receiver's receipt for the premises December 24, 1887. Mrs. M. C. Barton, the former wife of Castle, as defendant's witness, testified that the water used to reclaim the desert land was taken from the original ditch, and that none was secured from the slough below the dam near its head until 1888 or 1889, when Castle built a dam therein at the northwest corner of the desert land, and used the water only one season to irrigate about 18 acres of barley, and that this dam was washed out in 1894. The defendant, as a witness in his own behalf, testified that in 1899 he rebuilt this dam, and used water from the slough with which he irrigated about 30 acres of the desert land until May, 1901, when Beers removed the obstruction. This is about the extent of the use of water from the slough on that land, and if it be assumed that in 1873, when Castle helped to turn the water into the slough, he contemplated using it to irrigate that tract, it must be conceded that his appropriation was not very speedily made.

If the rule that water diverted from a natural stream must be applied to some beneficial use within a reasonable time, in order to preserve the right of appropriation, is applicable to the plaintiffs, it is evident that they are entitled to no more than is necessary to irrigate 35 acres, for the testimony conclusively shows that from 1874 to 1892 the area of their cultivated land that was irrigated with water taken from the slough was not increased. Beers testified that in 1874 Inskeep was irrigating about 35 acres with water taken from that source. M. J. Anawalt said that his father leased the premises in 1876, and raised about 35 acres of grain. F. C. Fletcher said that he lived at Ruby Ranch from 1875 to 1884, during which time Beers irrigated about 40 acres of grain. Marcos Reintra, who worked there about five years, said that in 1892 Beers irrigated about 30 or 40 acres. These witnesses appeared for

plaintiffs, and their testimony is uncontradicted. Joseph Newell, as defendant's witness, testified that he worked for Beers from 1885 to 1892; that in 1885 the water from the slough was not used by Beers, but permitted to flow into the creek; and that prior to 1892, when the witness left Ruby Ranch, Beers irrigated about 35 or 40 acres with water from the old channel. The testimony of this witness is contradicted by Beers, who said that Newell did not commence to work for him until 1886, and the witnesses W. H. Hicks, M. J. Anawalt, and Clinton Beers each testified that Newell was not employed by Beers until 1887, but no one contradicted his statement in relation to the area of plaintiff's cultivated land that was irrigated with water taken from the slough. The testimony shows, however, that in 1888 Beers built a dam in Jordan Creek near the southwest corner of section 23, and dug a ditch in a northwesterly direction, about four feet wide at the bottom, and carrying a depth of about seven or eight inches of running water all the time, which is used in irrigating section 22; that he also constructed another dam below this, and dug a ditch therefrom on the south side of the creek, and diverted water which he used in irrigating about 150 acres of land; that he has another ditch taken out of Cow Creek that supplies about 100 inches of water, which is used in irrigating his orchard and garden; and that for several years prior to the institution of this suit he has been using the water from the slough to irrigate a part of section 15, and that he now irrigates from the various sources about 1,000 acres of land.

In *Hall* v. *Blackman* (Idaho), 68 Pac. 19, Fielding Ethel and David B. Ethel, in 1871, formed a partnership, as Ethel Bros., to acquire and cultivate land, and purchased 480 acres, the north 320 of which was taken in the name of Fielding and the remainder in that of his brother. In 1872 they cultivated about 200 acres of the north part,

and, for the purpose of irrigating the entire 480 acres, diverted 500 inches of water from a natural stream, which by means of adequate ditches was conducted to and used upon the cultivated land, the excess flowing in a depression across the land conveyed to David. In 1886, the copartnership was dissolved, and the premises were divided in pursuance of an agreement that each should have and own one-half of the water so diverted, and that an old road running east and west through the land should form the boundary, Fielding executing to his brother a deed for all his part of the 320 acres lying south of the highway ; but the sealed instrument did not refer to the water right, except so far as it might be implied in the word "appurtenances." After this partition David put much of the land which he owned into cultivation, using in its irrigation one-half of the water so diverted until 1890, when he died, and W. H. Blackman became the owner of the south tract. In 1893 Fielding conveyed the north part to W. E. Wilson, who thereafter, and until the institution of that suit, divided the 500 inches of water equally with Blackman, but, maintaining that, as only three inches of water had been actually used in irrigating the land when it was conveyed to David, that was the quantity appurtenant thereto and the measure of Blackman's right, sought to prevent the latter from using any more than that so originally appropriated, and, having secured a decree to that effect, Blackman appealed. Mr. Justice SULLIVAN, speaking for the court, in modifying the decree and referring to the legal principle insisted upon by Wilson, said : "We are unable to agree with that contention under all of the facts of this case. Ethel Bros. jointly appropriated 500 inches of water for the irrigation of said 480 tract of land, and the question here involved is the same as if said land and appropriation of water was owned and made by one person. The evidence shows that said amount of water was diverted by

means of said ditches each succeeding irrigating season, and taken upon said land, and applied to the irrigation of about 200 acres thereof, up to 1886, when more of said tract was put into cultivation by David B. Ethel after the partnership division, and although they had but about 200 acres of said land in cultivation from 1872 to 1886 they preserved their right to the use of sufficient water to irrigate all of said tract that is susceptible of irrigation, and for that reason the rights of each, as shown by the evidence, must date from March 1, 1872, so far as water for the irrigation of the said 480 acres of land is concerned. This would not affect the date of Wilson's right to the use of water for the irrigation of land that formerly belonged to the partnership, which land he purchased from Fielding Ethel, but it requires a change in the date of the right of Blackman to the use of water in the land which he purchased from David B. Ethel, and which had belonged to said copartnership. The use of such water by Fielding and David B. Ethel was in common during the existence of their copartnership, although used upon the land entered by Fielding Ethel (as to the cultivated land), and the continuous use by each of those parties and their successors in interest of one-half of the water until shortly before this action was brought clearly establishes the right of plaintiff Wilson and appellant Blackman as of the same date to the amount of water required for the proper irrigation of the land which formerly belonged to said crop copartnership. The water appropriated by Ethel Bros., as copartners or tenants in common, for the reclamation and irrigation of said 480 acres of land, attached to and became appurtenant to all of said land, or the right to the use thereof became so appurtenant. The right to the use of water sufficient to irrigate the whole of said tract of land was preserved by the construction of ditches of sufficient size and capacity to carry onto said land a sufficient quan-

tity for that purpose, and by thus diverting and taking
that amount of water thereon. The evidence clearly shows
that that was done, and that said amount of water was so
conducted each successive irrigating season whenever said
stream carried that quantity of water."

6. We think, upon principle, whatever rights plaintiffs
have to use water from the slough depend upon their con-
tract entered into with Bacheler, and not upon their ap-
propriation of water to a beneficial use within a reason-
able time. To render definite the reason upon which this
conclusion is based, it is deemed necessary to describe
with some degree of particularity the valley formed by
the creek and slough and the parts thereof owned by the
parties hereto and others. From the testimony and the
maps offered in evidence it appears that Jordan Creek
flows through a canyon for about four miles, at the lower
end of which Castle, Tracy, and Bacheler built their dam
in what, after the survey, proved to be the northwest quar-
ter of the southwest quarter of section 19, in township 30
south, of range 45 east; from thence the stream flows
southwest in the adjoining township through sections 24
and 25; thence west through section 26; thence north-
west through sections 27 and 22 to the southwest corner
of section 15; thence west through section 16 to a point
near the southwest corner, where it forms a junction with
Cow Creek, and flows thence southwesterly through a
canyon for about twelve miles. Just above the dam re-
ferred to exists a slough or an old channel about thirty-
five feet in width and four in depth, that runs northwest
through section 19 in the township first mentioned, and
through sections 24, 23, 14, and to the center of 15, and
thence southwest through sections 15 and 16 in township
30 south, of range 44 east, connecting with Jordan Creek
near its confluence with Cow Creek. The land bordering
on Jordan Creek originally produced native grass caused

by the spring overflows of that stream, but above the line
of freshets it was covered with sagebrush, which having
been grubbed out in places where water could be used for
irrigation, the premises thus cleared have produced excel-
lent crops. Sections 15 and 23, in township 30 south, of
range 44 east, were granted by Congress to aid in the con-
struction of a wagon road, and the California & Oregon
Land Company, on July 14, 1900, conveyed the former
section to Beers and the latter to G. W. Clinton. For several
years prior to the commencement of this suit, Beers, E. H.
Clinton, and Castle claimed all the land lying between Jor-
dan Creek and the slough, except the odd-numbered sec-
tions, and jointly possessed the right to use the water from
the slough for irrigation, G. W. Clinton having succeeded
to the rights of E. H. Clinton in the premises. The plain-
tiff's· right in this respect was not secured, as in *Boyce* v.
*Cupper*, 37 Or. 256 (61 Pac. 642), by appropriating the
surplus water from the channel of a natural stream to a
beneficial use after the needs of the prior appropriators
were supplied, but it was obtained after having been di-
verted into a slough by agreement upon consideration of
their aiding in enlarging and maintaining the dam in
Jordan Creek. This contract made plaintiffs parties to
the diversion and tenants in common with the other joint
owners of the right to the use of water in the slough, and,
the plaintiffs having performed their part of the agree-
ment, their right, as against such joint owners, necessarily
continued unimpaired without any appropriation of the
water whatever by them, and it would appear that they
are entitled to their share thereof, irrespective of whether
or not they within a reasonable time increased the area of
their cultivated land that was irrigated from the slough :
*Hall* v. *Blackman* (Idaho), 68 Pac. 19. For the same reason
Castle, having aided in diverting water into the slough,

44 OR.——26

was the owner of an undivided one-half thereof, and, as against the plaintiffs and all others in privity of contract with him, had an unlimited time in which to apply his share to a beneficial use, and hence the right of the defendant, as the successor in interest of Castle, has not been lost by the delay in appropriating his share of the water.

It is alleged in the answer that the defendant is the sole and exclusive owner of an undivided one-half interest in the dam, slough, ditches, and water right, consisting of 2,000 inches of water from Jordan Creek to be used for irrigation, it being intimated that Clinton was the owner of the other moiety. The testimony shows that the defendant has at all times intended to permit one-half of the water in the slough to flow to Clinton's premises, and if the plaintiffs are entitled to a part thereof, which is not determined herein, they have not been deprived of their rights by the defendant, who, as the successor of Castle, is entitled to the quantity so claimed by him, and hence the decree is affirmed.          Affirmed.

---

Decided 1 March, rehearing denied 13 March, 1904.