Argued 11 April, decided 12 June, rehearing granted 28 August, 1905;
reargued 27 March, finally decided 1 May, 1906.

## SHARKEY v. CANDIANI.

85 Pac. 219.

REFEREE—JURISDICTION TO TAKE TESTIMONY IN ANOTHER COUNTY—
WAIVER OF OBJECTION.

1. Where a referee has without special authority taken the testimony
oᵢ witnesses in another county than the one in which he was appointed,
and more than 20 miles from the place of holding court, any objection to
such testimony for want of jurisdiction in the referee to take it is waived
by cross-examination.

MINES—CONCLUSIVENESS OF PATENT.

2. A patent from the United States for a mining claim is conclusive
as to all facts necessary to establish the validity of the patent against
adverse claimants.

EFFECT OF STATUTE REQUIRING NOTICE OF LOCATION.

3. Statutes providing for notices of mining locations, such as Section
3978, B. & C. Comp., are intended only as a means of determining the
rights of conflicting claimants, and therefore it will be a compliance with
such laws to make proper markings on the ground at any time before ad-
verse rights attach.

WHO MAY QUESTION SUFFICIENCY OF LOCATION.

4. Only adverse claimants under a subsequent notice or notices can
question the sufficiency of a location of a mining claim.

INITIATION OF VALID MINING CLAIM.

5. Under Section 2320, Rev. Stat. U. S., and Section 3975, B. & C.
Comp., a valid right to a mining claim is initiated by the discovery by a
qualified person of a vein of mineral-bearing rock in place on vacant
land of the United States, and the appropriation thereof by such person
by performing the acts prescribed in those statutes.

VALIDATION OF LOCATION BY SUBSEQUENT DISCOVERY OF VEIN.

6. A claim to mining ground void because no mineral vein was dis-
covered thereon prior to the posting of notices of location, will be val-
idated by a subsequent discovery of such a vein in place within such claim,
if no adverse rights have accrued in the meantime.

RIGHT TO FILE ON PATENTED GROUND.

7. No location can be made on land already patented unless it has
been abandoned so that it has again become part of the unappropriated
public domain.

ESTOPPED BY ACQUIESCENCE—ABANDONMENT.

8. Where the persons in possession of a mining claim were experienced
miners and familiar with the usual methods of marking the boundaries
of mining claims, with which a subsequent adjoining locator was not
familiar, and for many months saw such subsequent locator working on
an adjoining claim without objection until he had expended a large sum
of money and discovered valuable ore, when they claimed that he was
trespassing on their prior location, are equitably estopped from maintain-
ing such claim on the ground that they abandoned that part of the prior
location overlapped by the subsequent locator, the means of information
not being equal: Oviatt v. Big Four Min. Co. 39 Or. 118, distinguished.

WHAT CONSTITUTES ABANDONMENT.

9. No overt act is necessary to constitute an abandonment, it results
from an exercise of the will.

EFFECT OF ABANDONMENT ON TITLE TO REALTY.

10. An abandonment of a claim to real property does not have the effect of transferring the title to any one.

NEED OF PROMPTNESS IN CLAIMING MINING GROUND.

11. The possible fluctuations in the value of mining claims resulting from discoveries on other claims render it important that claimants should promptly and continuously assert any rights they may think they have in locations, and a failure to resent with reasonable promptness a trespass on a located claim will be considered an abandonment of the ground actually occupied by the trespasser.

EXTENT OF RIGHT OF COTENANT TO ABANDON CLAIM.

12. Though ordinarily a cotenant cannot, without special authority from his cotenants, abandon any greater interest in property than he personally owns, yet, in the present case, the position and general supervisory power of the resident managing partner, and the kind of property involved, induce the holding that such manager had power to bind all the owners by his negligence in permitting a subsequent locator to trespass upon and improve part of their claim for so long a time.

From Lane: JAMES W. HAMILTON, Judge.

Statement by MR. JUSTICE MOORE.

This cause having been reargued, the opinion heretofore announced, which has not been published, will be changed to accord with the view now entertained. This is a suit by Frank C. Sharkey, Louis Zimmerman, Fred E. Sharkey, and N. B. Standish, against C. F. Candiani, Caesar Marco and J. J. Tyler, to determine the right of possession of certain mineral land. The complaint states that the defendants secured a survey of what they designated as the "Doctor" lode in the unorganized mineral district of Blue River, Lane County, and applied for a United States patent therefor, whereupon plaintiffs interposed an adverse claim to a part of the premises included in such survey, and instituted this suit, alleging, *inter alia,* that they were in possession of the Louise and Lucky Boy No. 4 quartz mining claims, which were prior locations, the validity of which had been maintained, detailing the manner thereof and showing wherein the Doctor lode conflicted with such claims. The answer having denied the material allegations of the complaint averred that plaintiffs had abandoned all interest in the premises inconsistent with the boundaries of the Doctor lode, and that by reason of their conduct they ought to be estopped to assert any claim thereto, setting out the facts which, it is asserted, constituted the alleged impediment which the law raises to preclude

(48th Or.—8)

the maintenance of this suit. The allegations of new matter in the answer having been denied in the reply, the cause was referred, and from the testimony taken the court found that the defendants, by reason of plaintiffs' conduct, were entitled to the possession of the premises in dispute, and having rendered a decree in accordance therewith, the plaintiffs appeal.

                                        AFFIRMED.

For appellants there was an oral argument by *Mr. Zera Snow,* with a brief over the name of *Snow & McCamant,* urging these with other propositions.

I. The discovery of a vein of mineral bearing rock in place within the limits claimed is a condition of a lode location. Rev. Stat. U. S. § 2320; *Terrible Min. Co.* v. *Argentine Min. Co.* 89 Fed. 583; *Waterloo Min. Co.* v. *Doe,* 56 Fed. 689; *Nevada S. Oil Co.* v. *Home Oil Co.* 98 Fed. 677; *Ledoux* v. *Forester,* 94 Fed. 600.

II. In the absence of statute or local regulations defining what markings must be made, it is held that a claim otherwise regularly located must be marked on the ground so that its boundaries can be readily traced. Rev. Stat. U. S. § 2324; *Cheeseman* v. *Shreve,* 40 Fed. 787; *Doe* v. *Waterloo Min. Co.* 70 Fed. 458; *Ledoux* v. *Forester,* 94 Fed. 600; *Holland* v. *Mining Co.* 53 Cal. 149; *Geleich* v. *Moriarity,* 53 Cal. 217.

Where, however, a state statute or a mining regulation intervenes, compliance with such state statute must be shown, since the right of the state to so legislate has been uniformly upheld: *Northmore* v. *Simmons,* 97 Fed. 386; *Nevada S. Oil Co.* v. *Home Oil Co.* 98 Fed. 677; *Erhardt* v. *Boaro,* 113 U. S. 527; *Mining Co.* v. *Kerr,* 130 U. S. 256; *Kendall* v. *Mining Co.* 144 U. S. 664; *Sissons* v. *Sommers,* 24 Nev. 379 (55 Pac. 829).

III. A location once regularly made confers a right equivalent to patent, and every entry on such lands constitutes a trespass, and no location can be made by a trespasser. The pretended Doctor discovery was within the boundaries of the Louise location and therefore void: *Little Pittsburgh Co.* v. *Annie Min. Co.* 17 Fed. 57; *Aurora Hill Min. Co.* v. *85 Min. Co.* 34 Fed. 515; *Erwin* v. *Perago,* 93 Fed. 608, 612; *Belk* v. *Meagher,* 104 U. S.

279, 284; *Guillim* v. *Donnellan,* 115 U. S. 45, 49; *McCulloch* v. *Murphy,* 125 Fed. 147, 153; *Seymour* v. *Fisher,* 16 Colo. 188 (27 Pac. 240).

IV. The Louise and Lucky Boy No. 4 locations were patented, moreover, and this is conclusive as to the discovery of a vein and the regularity of the location: *Calhoun G. & M. Co.* v. *Ajax Min. Co.* 182 U. S. 499, 509 (21 Sup. Ct. 885, 45 L. Ed. 1200); *Smelting Co.* v. *Kemp,* 104 U. S. 636 (26 L. Ed. 875); *Anderson* v. *Bartels,* 7 Colo. 256 (3 Pac. 225); *Iron Silver Min. Co.* v. *Campbell,* 17 Colo. 267 (29 Pac. 513); *Uinta Tunnel Co.* v. *Creede Mill Co.* 119 Fed. 164, 166 (57 C. C. A. 200); *Last Chance Min. Co.* v. *Bunker Hill & S. Min. Co.* 131 Fed. 579 (66 C. C. A. 299).

V. There is no room here for applying the doctrine of equitable estoppel, which takes the form of a claim of abandonment, for to say that there is vacant ground up the hill in a mining country to one who knows that several claims are already staked close to that spot, states nothing certain, nor any fact calculated to deceive a reasonably prudent man.

An equitable estoppel never arises where there has been a *bona fide* mistake of the parties as to the location of the true boundary of the true owner, even where improvements have been made in reliance on such mistake: *Boggs* v. *Merced Min. Co.* 14 Cal. 279, 366; *Maye* v. *Tappan,* 23 Cal. 306, 309; *Minneapolis Mill Co.* v. *Minneapolis & St. L. Ry. Co.* 51 Minn. 304 (53 N. W. 639, 641); *Proctor* v. *Putnam Mach. Co.* 137 Mass. 159, 162; *Iverson* v. *Swan,* 169 Mass. 582 (48 N. E. 282); *Mullaney* v. *Duffy,* 145 Ill. 559 (33 N. E. 750).

To constitute an estoppel by the acquiescence of a party it is essential that he who is claimed to be estopped should have had knowledge of the facts, and he who claims the estoppel should have been ignorant of the truth, and have been led into doing that which he would not have done but for such silence: Bigelow, Estoppel (5 ed.), pp. 609, 618, 626; *Mullaney* v. *Duffy,* 145 Ill. 559 (33 N. E. 750); *Iverson* v. *Swan,* 169 Mass. 582 (48 N. E. 282); *Wait* v. *Gover,* 11 Ky. Law Rep. 750 (12 S. W. 1068); *Commonwealth* v. *Moltz,* 10 Pa. 527, 532 (51 Am. Dec.

567) ; *Warner* v. *Fountain,* 28 Wis. 413 ; *Henshaw* v. *Bissell,* 85 U. S. (18 Wall.) 255, 271 ; *Brant* v. *Virginia Coal & Iron Co.* 93 U. S. 326, 336 ; *Schraeder Mfg. Co.* v. *Packer,* 129 U. S. 688 (9 Sup. Ct. 385).

Equitable estoppel never arises as between conflicting claimants of land where the means of information are equal to both parties: *Gleeson* v. *Martin White Min. Co.* 13 Nev. 442, 468 ; *Maye* v. *Tappan,* 23 Cal. 306, 309 ; *Mullaney* v. *Duffy,* 145 Ill. 559 (33 N. E. 751) ; *Iverson* v. *Swan,* 169 Mass. 582 (48 N. E. 282) ; *Crest* v. *Jacks,* 3 Watts, 238 (27 Am. Dec. 353) ; *Brant* v. *Virginia Coal & Iron Co.* 93 U. S. 326, 337.

For respondents there were oral arguments by *Mr. Charles Albert Hardy* and *Mr. Lark Bilyeu,* with a brief over the names of *Thompson & Hardy* and *L. Bilyeu,* urging, among others, these points:

1. A location may be based on a discovery on the outcrop of the vein (*Davidson* v. *Bordeaux,* 15 Mont. 245, 38 Pac. 1075), and the discovery shaft need not be the shaft in which the vein is found: *O'Donnel* v. *Glenn,* 8 Mont. 248 (19 Pac. 302).

Moreover, a discovery after location, but before the intervention of adverse rights, validates the original location: *Zollars & H. C. Co.* v. *Evans,* 4 Mor. Min. Rep. 407 ; *Patchen* v. *Keeley,* 19 Nev. 404 (14 Pac. 347).

2. Proper marking of a location any time before the intervention of adverse rights is sufficient: *Crown Pt. Min. Co.* v. *Crismon,* 39 Or. 364 (65 Pac. 87) ; *North Noonday Min. Co.* v. *Orient Min. Co.* 9 Mor. Min. Rep. 539 ; *Jupiter Min. Co.* v. *Bodie,* 4 Mor. Min. Rep. 411.

3. Appellants had abandoned to respondents the ground embraced in the Doctor location and cannot be heard to assert a title they disclaimed. Any rights appellants may have had terminated when they located respondents on the ground and their acts and conduct thereafter are such that as far as respondents are concerned the ground embraced within the Doctor claim is as though appellants had never claimed to own or occupy it: *Golden Terra Co.* v. *Mahler,* 4 Mor. Min. Rep. 390 ; *Patterson* v. *Hitchcock,* 5 Mor. Min. Rep. 542 ; *Seymour* v. *Wood,*

53 Cal. 303; *Trevaskis* v. *Peard,* 111 Cal. 599 (44 Pac. 246);
*Johnston* v. *Standard Min. Co.* 148 U. S. 360 (13 Sup. Ct. 585).

4. Appellants claim by prior locations and having abandoned
the same and not claiming a relocation and there being no in-
tervening rights the status of the Doctor location at the time
of the commencement of the suit governs: *North Noonday Min.
Co.* v. *Orient Min. Co.* 9 Mor. Min. Rep. 529; *Jupiter Min.
Co.* v. *Bodie,* 4 Mor. Min. Rep. 411; *Golden Terra Co.* v. *Mahler,*
4 Mor. Min. Rep. 390; *Crown Pt. Min. Co.* v. *Crismon,* 39 Or.
364 (65 Pac. 87); *Brewster* v. *Shoemaker,* 28 Colo. 176 (53
L. R. A. 793, 89 Am. St. Rep. 188, 63 Pac. 309).

MR. JUSTICE MOORE delivered the opinion of the court.

1. It is contended by plaintiffs' counsel that an error was
committed in refusing to strike from the transcript much of
the testimony given by defendants' witnesses, because it was
taken out of the jurisdiction of the trial court, without an order
to that effect. The statute authorizes a court, when a suit is
at issue upon a question of fact, to refer the cause, and also to
appoint a special referee for the purpose of taking testimony of
witnesses residing more than 20 miles from the place of holding
court: B. & C. Comp. § 827. This suit was begun and tried in
Lane County, and the referee appointed therein, without an
order of special reference, went to Multnomah County, where,
over objection and exception of plaintiffs' counsel, the testi-
mony of defendants' witnesses was taken. These witnesses,
however, were cross-examined before such referee by plaintiffs'
counsel, who thereafter, in Lane County, offered testimony in
rebuttal thereof. In *Brush* v. *Mullany,* 12 Abb. Prac. (N. Y.)
344, it was insisted that a referee appointed in one county in
New York could not, without special appointment, take the testi-
mony of witnesses in any other county of that state, the court
holding that an objection interposed on that ground went to the
jurisdiction of the referee, and intimating that it was doubtful
whether or not an indictment for perjury would lie against any
of the witnesses who were sworn before him outside the county
in which he was appointed. In that case, however, a default by
all the defendants having been entered, the cause was referred

and the testimony taken in their absence, thus precluding the implication of a waiver. In *Blevins* v. *Morledge,* 5 Okl. 141 (47 Pac. 1068), an objection was interposed that a trial before referees was conducted outside the jurisdiction of the court, and it was held untenable where the point was not raised in the court below. It is fairly to be implied from the decision in that case that an objection to the taking of testimony by a referee outside the jurisdiction of the court appointing him could be waived by the parties. In New York a reference ordered by a court of special and limited jurisdiction requires the reference to take the testimony within such jurisdiction: *Bonner* v. *Mc-Phail,* 31 Barb. (N. Y.) 106. Where, however, attorneys stipulate that a referee appointed by a surrogate in a county of that state may take the testimony of witnesses in another county therein, and an order to that effect is entered, it cannot be subsequently attacked, on the ground of a want of jurisdiction, by a party who appeared before the referee in such other county and there participated in the proceeding had therein before such referee: *In re Davenport,* 37 Misc. Rep. 90 (74 N. Y. Supp. 740 . In the case at bar, though plaintiffs' counsel objected and excepted to the taking of the testimony by the referee in Multnomah County, they nevertheless participated therein by cross-examining the witnesses produced by the defendants. To strike from the transcript the testimony so taken would be to permit plaintiffs to speculate on securing a decree in their favor; but, failing in this respect, now to insist that an error was thereby committed, would be allowing them to take advantage of an irregularity which, in our opinion, they voluntarily waived, the want of jurisdiction being only to the person.

2. Considering the case on its merits, the transcript shows that prior to November, 1899, the plaintiffs and J. W. Moore and G. A. Dyson, as tenants in common, were in possession of the Louise and Lucky Boy No. 4 and other quartz mining claims in the Blue River District upon which improvements have been made of the value of about $40,000, the property being treated as one mine, which is known as the "Lucky Boy Group," and was under the supervision of the plaintiff Frank C. Sharkey

as managing partner. A statement of the means adopted by plaintiffs to secure a title to their claims is not deemed essential, for a patent from the United States having been executed to them therefor, except as to the premises in conflict, is conclusive of all the facts necessary to establish the validity thereof as against a party claiming adverse rights: *Anderson* v. *Bartels*, 7 Colo. 256 (3 Pac. 225) ; *Iron Silver Min. Co.* v. *Campbell*, 17 Colo. 267 (29 Pac. 513) ; *Uinta Tunnel Co.* v. *Creede Mill Co.*, 119 Fed. 164 (57 C. C. A. 200) ; *Last Chance Min. Co.* v. *Bunker Hill & S. M. Co.* 131 Fed. 579 (66 C. C. A. 299) ; *Smelting Co.* v. *Kemp*, 104 U. S. 636 (26 L. Ed. 875) ; *Calhoun Gold Min. Co.* v. *Ajax Gold Min. Co.* 182 U. S. 499 (21 Sup. Ct. 885, 45 L. Ed. 1200).

The defendant Candiani having been advised by Zimmerman to go to the Blue River mining district and secure a quartz claim, accepted from him a letter of introduction which, in November, 1899, he presented at the mines to Frank C. Sharkey, who showed him and his associate, one G. B. Perelli, every attention possible. After remaining plaintiffs' guests several days, Candiani and Perelli went to a tunnel on one of the claims, known as the "Gold Dollar," where they saw Dyson, who, in answer to their inquiry as to whether or not there was any mining property that could be secured in that vicinity, informed them that vacant public land could be found just above the place where he was working, showing them the northeast and northwest corners of the Gold Dollar claim. Perelli, going a few feet north of the boundary of such claim, prospected the ground, and returning to the tunnel wrote a location notice, calling the premises the "Doctor" claim. Dyson signed his name as a witness to the notice, which was posted on the stub of a tree on the claim selected. The day being very stormy, Dyson agreed to mark on the ground the boundaries of the Doctor claim, and Candiani and Perelli in a day or two thereafter left the mines without informing the superintendent of the location they had made. Candiani, on returning to Portland, however, told Zimmerman that he had established a claim joining the Gold Dollar. In the winter of 1899 or 1900, Dyson and Standish made

some markings of the Doctor claim, for which service Candiani sent the former by Zimmerman $10 in payment thereof, but when this money was delivered, Zimmerman did not know that Dyson had indicated any line on the Doctor claim.

The statute of this State in force when Candiani attempted to establish the Doctor lode required the locator of a mine, before the expiration of 90 days from the date of posting the notice of selection of mineral land, to sink a discovery shaft upon his claim to the depth of 10 feet, or deeper, if necessary, to show a vein of mineral deposit in place: Laws 1898, pp. 16, 17, § 3. No work having been done on the Doctor claim within the time prescribed, Candiani returned thereto and posted thereon another notice, of which the following is a copy, to wit:

"Notice is hereby given that Charles F. Candiani, a citizen of the United States of America, conforming to the mining laws thereof, and of the State of Oregon, and the local rules, regulations and customs of miners, has located, and by this notice do relocate, claim known as the Doctor lode or mining claim, said claim being discovered on the 16th day of November, 1899, and do claim 960 feet on this lead, lode or vein, bearing mineral in place, by 600 feet in width, the same being 300 feet on each side of the center thereof, together with all dips, spurs and angles and all other veins or lodes the top or apex of which lie within said boundaries, situate in Blue River Mining District, County of Lane, State of Oregon, said location being described and marked on the ground as follows, to wit:

From this notice of location running 300 feet in a westerly direction to a stake marked 'Southwest stake of Doctor lode'; thence 950 feet in a northerly direction to a stake marked 'Northwest stake of Doctor lode'; thence running 600 feet in an easterly direction to a stake marked 'Northeast stake of Doctor lode'; thence running 300 feet in a westerly direction to this notice of location.

This claim is joining the northeast line of the Gold Dollar claim, and is the extension of the same, and I intend to hold and work said claim in accordance with the local customs and rules of miners and the mining laws of the United States and of the State of Oregon.

Dated on the ground the 14th of February, 1900.
Located February 14, 1900.
Discovered November 16, 1899.

C. F. Candiani."

He also cut a tunnel into his mine, and prior to June, 1901, made other improvements on the property of the value of about $8,000, when Frank C. Sharkey, having discovered that the Doctor lode conflicted with plaintiffs' mining claims, took possession of such tunnel and ejected Candiani from the premises, thereby precipitating a difficulty which resulted in this suit.

The statute of this state permits a citizen of the United States, or one who has declared his intention of becoming such, who discovers upon the unappropriated public domain a lode of mineral bearing rock in place, to locate a claim on the vein by posting thereon a notice which shall contain:

"First, the name of the lode or claim; second, the name or names of the locator or locators; third, the date of the location; fourth, the number of linear feet claimed along the vein or lode each way from the point of discovery, with the width on each side of the said vein or lode; fifth, the general course or strike of the vein or lode as nearly as may be."

A locator is also required to define

"The boundaries upon the surface of each claim so that the same may be readily traced. Such boundaries shall be marked within thirty days after posting such notice by six substantial posts, * * or by substantial mounds of stone, * * one such post or mound of rock at each corner and at the center ends of such claims": B. & C. Comp. § 3975.

"Any and all locations or attempted locations of quartz mining claims within this state subsequent to the 31st day of December, 1898, that shall not comply and be in accordance with the provisions of this act shall be null and void": B. & C. Comp. § 3984.

An examination of the last notice posted by Candiani will show that it fails in many respects to comply with the statutory requirements, and evidently omits to designate the eastern boundary of the Doctor claim.

3. The trial court, *inter alia,* found, and we think the conclusion is fully warranted by the testimony:

"That no markings of the Doctor claim for the purpose of marking out on the ground the boundaries thereof was ever made until the time of the survey for patent, other than such as was made by Dyson and Standish in December, 1899."

Though our statute has prescribed certain conditions which must be performed in order properly to locate a mining claim,

and provided that a failure to comply therewith should annul every attempted location, the enactment was evidently designed as a guide only, to determine the rights of conflicting claimants, thus permitting the proper marking of a location at any time before adverse rights attach: *McGinnis* v. *Egbert,* 8 Colo. 41 (5 Pac. 652) ; *Jupiter Min. Co.* v. *Bodie Min. Co.* 4 Mor. Min. Rep. 411; *North Noonday Min. Co.* v. *Orient Min. Co.* 9 Mor. Min. Rep. 529; *Crown Pt. Min. Co.* v. *Crismon,* 39 Or. 364 (65 Pac. 87).

Unappropriated lands of the United States containing valuable deposits of mineral are subject to exploration, occupation and purchase, under regulations prescribed by law, so far as the same is applicable and not inconsistent with the acts of Congress: Rev. Stat. U. S. § 2319 (U. S. Comp. St. 1901, p. 1424, 5 Fed. Stat. Ann. 4). In commenting upon legislation which the act of Congress of July 4, 1866, authorizes, Mr. Lindley, in his work on Mines (2 ed. § 249), says: "If the state may prescribe any additional or supplemental rules, increasing the burdens or diminishing the benefits granted by the federal laws in land of the public domain, it is simply because the government, as owner of the property, sanctions, expressly or by implication, the exercise of such powers." This author, in discussing the necessity for a substantial compliance with the requirements of the acts of Congress in respect to securing public land containing valuable mineral deposits, and of legislation by the states supplemental thereto, which are treated as conditions precedent to the completion of a valid location, further observes: "The order in which the several acts required by law are to be performed is nonessential, in the absence of intervening rights." Lindley, Mines, § 330. In *Sisson* v. *Sommers,* 24 Nev. 379 (55 Pac. 829, 77 Am. St. Rep. 815), is was held that a failure substantially to comply with the provisions of a statute of Nevada, which required a locator of a mining claim to sink a discovery shaft within a prescribed time after posting a notice of location, forfeited the rights of the locator, whether or not the statute contained a clause to that effect. In deciding the case, the court, referring to the federal and to the state laws and to the rules

and regulations of miners relating to the steps necessary to be taken to secure a mining claim, say: "Failure to comply with such laws and rules works a forfeiture, whether the laws and rules provide for forfeiture for noncompliance or not, and the mining claim becomes subject to location by any qualified locator." As a forfeiture results from a failure substantially to comply with the requirements of a state statute prescribing the method to be pursued to obtain a mining claim, whether or not such statute so declares the penalty, the clause of our law (B. & C. Comp. § 3984), providing that any attempted location of a quartz mining claim that shall not be in accordance therewith shall be null and void, adds nothing to the enactment which would be so construed in the absence thereof, in case of adverse claimants.

4. State legislation supplemental to the acts of Congress, which prescribes the method to be pursued by a locator as a condition precedent to making a valid appropriation of the public lands of the United States, containing valuable mineral deposits, is designed as a rule of evidence only, to determine the rights of an adverse claimant of the premises, under a subsequent location thereon of a mining claim. This must, upon principle, be the object of such laws, otherwise the enactments, in case no adverse claim is interposed, would be an interference with the primary disposal of the soil by a state, which is inhibited by the enabling act by which it became a part of the Union. Congress has impliedly invited miners to adopt rules and regulations and, in the same manner, requested state and territorial legislatures to enact laws protecting the rights of claimants of mineral lands, which rules and laws are recognized, when not in conflict with the federal statute, and enforced by the courts in cases involving a contest. The right of the defendants to the Doctor claim depends upon acts of the plaintiffs, constituting an alleged equitable estoppel, tantamount to an abandonment, and, as the plaintiffs did not make a subsequent location of the premises, we do not think they are in a position to insist upon a strict performance of the state statutory requirements by the defendants, whose rights, if they exist, must rest upon the alleged abandonment.

5. It is the discovery by a qualified person of a lode or vein of mineral bearing rock in place, on the vacant land of the United States, and the appropriation thereof, evidenced by posting a notice, and recording the same when so required, and by marking on the ground the boundaries so that they may be readily traced, that initiates a valid mining claim, the right to the continued possession of which is maintained by annually performing the work prescribed for its development, until a patent has been secured: Rev. Stat. U. S. § 2320 (U. S. Comp. St. 1901, p. 1424, 5 Fed. Stat. Ann. 4); Laws 1898, p. 16, § 1; B. & C. Comp. § 3975; *Jackson* v. *Roby,* 109 U. S. 440 (3 Sup. Ct. 301, 27 L. Ed. 990); *Erhardt* v. *Boaro,* 113 U. S. 527 (5 Sup. Ct. 560, 28 L. Ed. 1113); *O'Reilly* v. *Campbell,* 116 U. S. 418 (6 Sup. Ct. 421, 29 L. Ed. 669).

6. It is very doubtful if either Perelli or Candiani found a vein of mineral bearing rock in place within the Doctor claim prior to posting the respective notices thereon, but the testimony shows that the latter, after February 14, 1900, discovered a lode therein, and if no adverse rights have accrued, the subsequent discovery validates the prior insufficient location: *Zollars & Highland Chief Co.* v. *Evans,* 4 Mor. Min. Rep. 407; *Patchen* v. *Keeley,* 19 Nev. 404 (14 Pac. 347). Thus, in *Brewster* v. *Shoemaker,* 28 Colo. 176 (63 Pac. 309, 53 L. R. A. 793, 89 Am. St. Rep. 188), it was held that when the location of a mining claim was void because no mineral had been found within its boundaries, a subsequent discovery of precious metal therein, made after filing the certificate of location, but before the rights of adverse parties had attached, would sustain the location. In deciding that case, Mr. Chief Justice CAMPBELL, speaking for the court, says: "The order of time in which these several acts are performed is not of the essence of the requirements, and it is immaterial that the discovery was made subsequent to the completion of the acts of location, provided only all the necessary acts are done before intervening rights of third parties accrue. All these other steps having been taken before a valid discovery, and a valid discovery following, it would be a useless and idle ceremony, which the law does not

require, for the locators again to locate their claim and refile their location certificate, or file a new one."

7. The patent plaintiffs secured for that part of the Louise and the Lucky Boy No. 4 mining claims, not a conflict with the Doctor lode, having established the validity of the former claims as hereinbefore stated, no subsequent location could be made thereon unless they abandoned their rights thereto so as to render the premises in dispute a part of the unappropriated public domain. They did not make a location subsequent to defendants', so as to initiate a new right and thus to take advantage of the invalidity of the defective notice, or for any other reason, and hence the only questions to be determined are the alleged abandonment and the identity of the premises embraced therein.

8. It will be remembered that Dyson and Standish, two of the co-tenants, made some markings on the ground to evidence part of the boundaries of the Doctor lode. All the co-tenants, except Moore and Zimmerman, were at the mines and saw Candiani working on the Doctor claim, to which for 18 months they made no objections, but congratulated him on the progress he was making in cutting the tunnel, until he had expended about $8,000 and discovered valuable ore, when it was ascertained that he was trespassing on their property. The testimony shows that when Candiani first went to the mines Zimmerman informed him of the number of mineral claims plaintiffs possessed and told him about how they were situated with respect to each other. Dyson and Standish were pioneers in the Blue River district, and at the time Candiani first posted a notice on the Doctor lode, they were in possession of the Louise and the Lucky Boy No. 4 mining claims. The latter claims were originally surveyed in 1896, the center line "brushed out" and stakes set at the corners, but the country where these mines are situated is mountainous and the surface covered with dense brush and timber. We think it fairly inferable from the testimony that until June, 1901, when the "Lucky Boy Group" was surveyed for a patent, neither of the respective parties nor their predecessors in interest knew that the Doctor lode conflicted with either of plaintiffs' mining claims. Candiani was a novice in

mining, while Dyson and Standish, and most of the other co-tenants claiming the Louise and the Lucky Boy No. 4, were experienced in extracting ores and must have known the method generally adopted of marking on the ground the boundaries of mining claims, of which Candiani was ignorant. The means of information were, therefore, not equal to the respective parties, and this being so, an estoppel may arise to prevent the plaintiffs from asserting their right to the premises in conflict, on the ground of abandonment. Abandonment, it is true, is generally understood to mean the intentional relinquishment of a known right: *Oviatt* v. *Big Four Min. Co.* 39 Or. 118 (65 Pac. 811).

9. The rights of the plaintiffs and of their predecessors in interest to that part of the Louise and of the Lucky Boy No. 4 mining claims, which is in conflict with the Doctor lode, were inchoate when Candiani first attempted to locate a vein thereon, and hence they were susceptible of abandonment, which is equivalent to a relinquishment to the United States of all interest therein. An abandonment results from a mere exercise of the will.

10. So far as it relates to a vested estate in real property an abandonment is ineffectual to transfer the title: *City of Philadelphia* v. *Riddle,* 25 Pa. 259.

11. Experience in the mining regions teaches that locations of mineral bearing rock are frequently made on public land for speculative purposes only, and are often considered of little value until paying ore is discovered in the immediate vicinity, when, without any expense to the locators, they may become of immense worth. Such possible fluctuations in value demand a different rule from that which usually governs vested estates in land, and necessitates immediate assertion of inchoate rights in mining claims, when, by the exercise of reasonable diligence, the locators could have discovered that their premises were being invaded. Dyson, Standish, and Frank and Fred Sharkey, who are experienced miners and should have known the location of the boundaries of the Louise and of the Lucky Boy No. 4 mining claims, ought to be estopped to assert that they had any interest therein in conflict with the claim of Candiani as originally

indicated on the ground. To allow them to assert an adverse claim to that part of the Doctor lode now in controversy, as it should be surveyed, would be violative of every principle of equity and result in rewarding them for encouraging the development of the property.

12. Zimmerman, who owns five twelfths of the Lucky Boy group of mines, resides in Portland, and though he knew Candiani had located a mine in the Blue River district, he was not aware that it conflicted with either claim in which he was interested. Frank C. Sharkey, as superintendent and managing partner, however, represented Zimmerman and also his predecessor in interest, Moore, in supervising the property, and, though such agent could not, ordinarily, without special authority from all the co-tenants, abandon any greater interest than he alone possessed (*Beers* v. *Sharpe,* 44 Or. 386, 75 Pac. 717; *Conn* v. *Oberto,* 32 Colo. 313, 76 Pac. 369), the character of his employment and the kind of property in controversy induce the conclusion that he possessed sufficient authority from all the cotenants to bind them by his negligence in permitting Candiani to take, hold possession of and improve their property for such a length of time.

This brings us to a consideration of the boundaries of the Doctor lode as they should be established. The evidence shows that October 26, 1898, F. C. Sharkey and Geo. A. Dyson located a quartz mining claim, known as the "Gold Dollar," the description of which, as given in the notice, is as follows:

"Commencing at this tunnel and notice and running in a southerly direction towards Main Quartz Creek and situated about 400 feet west of the Lucky Boy ledge, and was formerly known as the Jo. Andrews claim."

Until the plaintiffs secured a survey for a patent, June, 1901, they evidently thought that the Gold Dollar claim was located west of and parallel with the Lucky Boy group, for when Candiani and Perelli first went to the district with a view of securing a claim, they were informed by Dyson that unappropriated mineral land of the United States could be found at the northerly end of the Gold Dollar claim, the corners of which, on that line, were evidenced by stakes which he pointed out to these

visitors. The survey referred to disclosed that the side lines of the Louise and of the Gold Dollar claims extended north 40 deg. 30 min. west, and north 13 deg. 30 min. west respectively, and that the north center end of the latter claim was situated about 480 feet southerly from the northwest corner of the Louise claim and on or near the western boundary thereof. The Lucky Boy No. 4 claim is a northerly extension of the Louise, and the Doctor lode, as surveyed, is a northerly extension of the Gold Dollar claims, the side lines of which are 260 and 683 feet respectively.

Dyson, as plaintiffs' witness, testified that, having been employed by Candiani to mark on the ground the boundaries of the Doctor lode, he placed a center end notice on the stub of a tree a few feet north of the boundary of the Gold Dollar claim; that he put up stakes at the northeast and northwest corners of the latter claim for the southeast and southwest corners, respectively, of the Doctor lode; that, going northerly about 900 feet, he put up another center end notice, and also nailed to a tree another stake on which he wrote, as near as he could remember, "Northwest center end stake of the Doctor mine," and signed the names of Candiani and Perelli as locators; that, having done the writing found on the stake, he was able to read it, saying the word "center" is what he put on it. The stake last referred to was torn down, identified by the witness, offered in evidence, and is sent up for our inspection. There is written on the upper line thereof, with a lead pencil, the following: "N. W.," and a word that is illegible, but appears to begin with the letter "C" and to have the letter "t" therein. The second line is, "of Doctor Mine"; the third, "Perelli"; and the fourth, "Candiani."

A re-examination of the testimony convinces us that when Dyson and Standish originally indicated on the ground the boundaries of the Doctor lode, it was their intention to extend the side lines of the Gold Dollar about 900 feet, so as to include the claim attempted to be located by Candiani and Perelli. Standish appeared as plaintiffs' witness, but he did not attempt to corroborate Dyson's testimony to which reference has been

made. In the absence of such supporting declarations under oath, and from the fact that the Doctor lode was intended and attempted to be located as an extension of the Gold Dollar claim, we think Dyson's testimony should be disregarded, and conclude that the surveyor properly treated the tree having the stake so marked thereon as the northwest corner instead of the northwest center end.

The decree heretofore rendered will be changed to conform with the views now expressed, thereby affirming the decree of the court below; the defendants to recover their costs and disbursements in both courts.                    AFFIRMED.

Decided 9 January, 1906.