F. S. BARNES, Appellee, v. THUET BROTHERS *et al.,* Appellants.

**Constructive Trusts:** ADVANCE DRAFT FOR SHIPMENTS: *Absence of fraud.* A stock buyer habitually drew in advance of shipments on defendants, who were live stock commission merchants, to whom or whose consignees he shipped; and plaintiff cashed such advance drafts to enable the buyer to pay for the cattle he purchased. Defendant always paid the drafts from the proceeds of the shipment, and knew that the money advanced by plaintiff was always used by the buyer to pay for the stock. The draft in suit was drawn by the buyer and cashed by the plaintiff in the usual course of these dealings, but though the cattle paid for with the proceeds of the draft were sold by defendants' consignee, and the proceeds credited to defendants, payment was refused by defendants on the ground that the buyer was indebted to them. *Held,* that, though defendants

had no intent to defraud plaintiff, equity would impress the proceeds of the shipment purchased with the discount of the dishonored draft with a trust in plaintiff's favor.

*Appeal from Woodbury District Court.*—HON. JOHN F. OLIVER, Judge.

### SATURDAY, APRIL 12, 1902.

ACTION in equity to impress a trust upon money in the hands of the defendants. Judgment for the plaintiff. The defendants appeal.—*Affirmed.*

*A. L. Beardsley* for appellants.

*M. J. Sweeley* and *B. Radcliffe* for appellee.

SHERWIN, J.—The plaintiff is a banker in the town of Marcus, Iowa. The defendants are live stock commission men, doing business in Sioux City, Iowa. For some time prior to January, 1900, one W. F. Lindley had been buying stock at points other than Marcus and shipping the same to the defendants at Sioux City for sale. Lindley had but a small amount of capital, and by arrangement with the defendants he drew on them through local banks where he was buying stock for the larger part of the money necessary to pay therefor. In January, 1900, he commenced buying stock in and around Marcus, and made several shipments therefrom. He opened an account with the plaintiff's bank, and drew drafts on the defendants for about the amount of each shipment, and shipped some of the stock to them at Sioux City, and the rest to Clay, Robinson & Co., of Chicago, consigned to the defendants. All of the drafts so drawn on the defendants, up to the one involved in this controversy, were honored by them without question. On the third day of February, 1900, Lindley took in two car loads of cattle, and drew on the defendants, through the plaintiff's bank, for $2,250, which amount was placed to his credit, and he checked thereon to pay

the balance due on the bunch of cattle ($2,201.56); he having previously paid $50 on the purchase price. On the day following the cattle were shipped to Clay, Robinson & Co., Chicago, for account of these defendants. The draft was sent by the plaintiff to his correspondent in Sioux City, and was presented to the defendants for payment early Monday forenoon, February 5th. It was not paid, nor was its payment then refused, but the Sioux City bank was told that the defendants had not yet seen nor heard from Lindley, which would be necessary before they could determine whether they would pay the draft. They were called over the telephone several times during the day, and asked about the matter, and gave the same answer, until late in the afternoon, when they refused to pay it on the ground that it was an overdraft. About an hour after their refusal they received telegraphic information that a part of the stock shipped February 4th had been sold, and the proceeds thereof credited to them. The defendants' bookkeeper was in Marcus on the fourth and a part of the fifth of February, and learned as early as the evening of the fourth, at least, that the stock had been shipped to Chicago, and that a draft to procure money to pay for the same had been drawn on the defendants. He returned to Sioux City on the forenoon of the fifth. The rest of the stock was sold in Chicago on the seventh of February, and the proceeds therefrom credited to the defendants. The plaintiff knew that the money he had advanced on the draft went to pay for this stock, and that it was to be shipped to Chicago, consigned to the defendants.

The cattle were sold for less than the amount advanced by the plaintiff, and he seeks to recover only the amount received by the defendants on account thereof. And this, we think, he is entitled to, upon principles of equity, and that, from the clear and practically undisputed showing in this case, the defendants are not entitled to one dollar of this money. It is manifest that up to the time of the last ship-

ment all parties had been acting in the utmost good faith. The plaintiff had been advancing money on the strength of the defendants' responsibility, and with their approval, for all parties knew that Mr. Lindley was not able to handle these stock transactions; and this is equally as true as to the last shipment, so far as the plaintiff was concerned, for the money for this purchase was procured exactly as had been done for the others. The defendants, however, seemed to think this an opportune time to balance accounts with Lindley at the expense of the plaintiff, and not only refused to honor his draft, but now attempt to hold enough of the proceeds from the sale of the cattle paid for with plaintiff's money to wipe out Lindley's previous indebtedness to them. It could hardly be questioned that, as between the plaintiff and Lindley, equity would protect the plaintiff, and if it became necessary, might possibly declare a lien in his favor on the stock purchased with his money, or on the money received from its sale; for the plaintiff furnished the money, and it was received and used by Lindley for a specific purpose. It was fully understood between them that the purchase price of that particular stock was to be repaid from the proceeds of its sale. The entire course of their dealing was on this theory, and with the understanding that Lindley was simply drawing the price in advance of his sale. There was then an implied agreement, at least, that the money coming from the sale of the cattle should pay their purchase price. True, the plaintiff expected to get his money directly from the defendants, because of the draft which he expected they would honor. If Lindley, instead of shipping the cattle on account of the defendants, had received the money from their sale himself, and refused to pay the plaintiff, we think equity could reach it in his hands, or in the hands of a third person with notice, and apply it to the payment of the plaintiff's claim. 2 Story, Equity Jurisprudence (13th Ed.), 577. When the defendants received the money from the sale of this stock, they knew all the circumstances connected with the transaction. They knew that it

was the primary source from which the plaintiff must be reimbursed, if at all, because they had already dishonored Lindley's draft, and knew that he had no other means of paying. Under these circumstances equity should impress this fund with a constructive trust in favor of the plaintiff, for it would be most inequitable and unjust to permit the defendants to retain it. The defendants' acts amount to constructive fraud, at least; and in such a case equity will declare a constructive trust for the purpose of administering justice and right, though such a trust was not within the contemplation of the parties. *Commissioners v. Stair,* 57 N. J. Ch. 433 (41 Atl. Rep. 495); *Association v. Campbell,* D. C. 43 L. R. A. 622. In the last case it is said: "Equity will impress a trust contrary to the intention and will of a party where a fund has been obtained by him in violation of his duty to another. In order to raise this duty, there need be neither a promise for the benefit of another, nor express fiduciary relations between them. It may be raised by representations, conduct and the like, that have been relied upon by another under such circumstances as create an equitable estoppel upon one to pursue thereafter an opposite course for his own advantage. Actual fraud, intentional as regards the party seeking relief, is not essential to the raising up of a constructive trust, any more than an equitable estoppel. If one makes an appropriation of a fund which, if permitted to stand, would, by reason of the circumstances attending the transaction, work a wrong to another having an equity therein, and give him an unconscientious advantage over that other, the act will be regarded as what is called a 'constructive fraud,' in equity." The same principle is announced in *Angle v. Railroad Co.,* 151 U. S. 1 (14 Sup. Ct. Rep. 240, 38 L. Ed. 55); 2 Pomeroy, Equity Jurisprudence, sections 1044, 1053. Mr. Pomeroy says the forms and varieties of these constructive trusts are practically without limit, and we are of the opinion that this is a case calling in strong terms for

the application of the doctrine. In none of the cases cited by the appellants is the precise question here presented involved. In *Acker v. Priest*, 92 Iowa, 610, there was no fraud of any kind, and it is said that there is no construcitve trust for that reason. No fraud is involved in *Jones v. Storms*, 90 Iowa, 396. *Hodges v. Kimball*, 49 Iowa, 577, was a replevin action. In *First National Bank v. Dubuque S. W. Ry. Co.*, 52 Iowa, 378, no fraud appeared. *Johnson v. Clark*, 20 Ind. App. 247 (50 N. E. Rep. 762), was a suit at law on a draft similar to the one drawn here, and does not touch the question of constructive trusts and fraud.

The judgment is right, and it is AFFIRMED.