Argued October 2, reversed October 23, 1928.

# THE FIRST NATIONAL BANK OF NORTH BEND *v.* UNITED STATES FIDELITY & GUARANTY CO. ET AL.

(271 Pac. 56.)

148

For appellant there was a brief over the name of *Messrs. McCamant & Thompson,* with an oral argument by *Mr. Wallace McCamant.*

For respondent there was a brief over the names of *Mr. Chester A. Sheppard* and *Mr. W. D. Burnett,* with an oral argument by *Mr. Wm. C. Ralston.*

BEAN, J.—The answer of the respondent asserts that it was understood between the bank, the respondent and the contractors, at the time the letters were given, that the bank would be protected only on such moneys as it collected on estimates for work actually done each month, and that the letters were not intended to give the bank, which was so understood by it, the right to collect the retained percentages or retained estimates. It was further con-

tended in the answer, by way of defense to the bank's claim, as follows:

First: That no retained percentages ever became due the contractors, for the reason that they defaulted and abandoned their contract:

Second: That the order and power of attorney, under which the bank claimed, were invalid as an assignment, both in law and equity, as between all of the parties concerned.

Third: That the letters, on which the bank relied, neither attempted to nor constituted a waiver of the respondent's subrogation agreement with the contractors.

Fourth: That the bank had no claim in equity to the reserved percentages, for the reason that it misapplied monthly estimates received by it to pay off a previous loan made to the contractors.

Fifth: That the respondent was compelled to complete the road contracted for, at a loss of $63,000.

Sixth: That the right of the bank to the fund in question was previously adjudicated in the District Court of the United States for the District of Oregon, which suit as to the present claim is *res adjudicata*.

The power of attorney from Payne & Padrick to the bank executed February 16, 1924, and which was duly acknowledged, authorized the bank as attorney of the contractors, "to indorse my name on and collect money due on checks drawn in my favor by any disbursing officer of the United States for whatever account (Detroit-Niagara Section of Forest Roads)"; such authority to remain in full force until revoked. This power of attorney was filed in the office of the Road Bureau on February 21, 1924.

The contract provided that the government should retain 10 per cent of the monthly estimates until the completion of the work. On February 14, 1925, the contractors executed, and deposited with the Road Bureau, an order to the Road Bureau to pay to the plaintiff bank the moneys so retained, $6,533.84, pursuant to the authorization of February 20, 1924, when the time should come for such payment.

On July 18, 1924, the contractors abandoned the work and so notified the district engineer of the United States Bureau of Public Roads, by letter.

A copy of the notice which was on the letter-head of respondent was served upon the guaranty company. The company for its own protection took over the work and completed the contract at an expense of about $60,000 more than it received from the government. The company received the estimates rendered the contractor for the month of July, 1924.

The percentage, as retained by the United States prior to the abandonment of the contract by the contractors, as shown by final settlement, aggregated $6,533.84; with this was included $687.02 for equipment returned to the government by the surety. A draft for $7,220.86, including these two amounts, was issued by the comptroller-general and received by the surety company and paid on October 14, 1925.

The plaintiff contends that respondent was in the position of trustee for the bank to the extent of the money so received and that the letters of the respondent assured the bank that it would have precedence over the surety company in payment of all of the money due the contractor on the monthly estimates, including the reserved percentages up to the time of the abandonment of the contract.

As the 90 per cent of the money came in from the monthly estimates, the bank applied the same to the indebtedness of the contractors, and then new loans were made to enable them to continue the work. In a number of cases the moneys received on account of the contractors were in excess of the indebtedness owing by them to the bank, and the balance, after paying the notes, was credited in the bank to the contractors.

On March 27, 1925, before the surety company had received the reserved percentages of the money earned by the contractor, the bank brought suit against the surety company in the District Court of the United States for the District of Oregon. The bank's bill of complaint, after amendment, included only the estimate for July, 1924. This suit was settled by the payment to plaintiff by the company of $3,650, and according to the terms of settlement the bank gave the contractors credit for the full amount, $5,147.74, which was 90 per cent of the July estimate. This left a balance due from the contractors to the plaintiff of $6,583.25, not including interest. An execution on a judgment, including this amount, has been returned unsatisfied.

The work was carried on in the name of Payne and Padrick until the road was completed. All checks were drawn in their favor and were indorsed by respondent under authority of defendant Padrick executed on July 18, 1924, in the name of his firm at a time when it is claimed the partnership had been dissolved.

■ The reserved percentages were, among other things, for the protection of the surety. This, however, did not prevent the surety from agreeing "to the payment of the moneys due, or to become

due, under the contract in question," to the bank. The surety company, as shown by its letters to plaintiff, so consented apparently in order to induce plaintiff to finance the contractors in performing the work so that the company would not be compelled to take over the work, or become liable on its bond.

Again, in the letter of the respondent dated April 9, 1924, the company as such surety "consents to the assignment to your bank of the estimates under said contract in consideration of advances made by your bank to these contractors to carry on the work." This consent included the reserved percentages, $6,533.84, in controversy in this suit. It was given for a valuable consideration. It is clear that the agreement is not for the payment to the bank of a portion of the estimates, 50 per cent or 90 per cent, but of the whole thereof.

■ The surety company, having by such arrangement induced the plaintiff to make the advances to the contractors in reliance upon the agreement of the contractors, consented and agreed to by the respondent, it would not be consistent with equity and good conscience to permit the surety company to collect and retain a portion of the moneys so assigned and hypothecated to the bank to reimburse it for money so loaned and which remained unpaid. To do this would be a plain violation of the agreement made understandingly by the respondent company.

■ ■ In 2 Story's Equity Jurisprudence (12 ed.), Section 1255, we read:

"One of the most common cases in which a court of equity acts upon the ground of implied trusts *in invitum,* is where a party has received money which

he cannot conscientiously withhold from another party. It has been well remarked that the receiving of money, which consistently with conscience cannot be retained, is in equity sufficient to raise a trust in favor of the party for whom, or on whose account, it was received. This is the governing principle in all such cases, and, therefore, whenever any interest arises, the true question is, not whether money has been received by a party, of which he could not have compelled the payment, but whether he can now, with a safe conscience, *ex aequo et bono*, retain it.''

In 26 R. C. L. 1235, Section 82, it is said:

"Equity will impress a trust contrary to the intention and will of a party where a fund has been obtained by him in violation of his duty to another. In order to raise his duty as the foundation of a constructive trust there need be neither a promise for the benefit of another, nor express fiduciary relations between them. It may be raised by representations, conduct and the like that have been relied on by another under such circumstances as create an equitable estoppel on one to pursue thereafter an opposite course for his own advantage.''

See, also, *Anglo-Am. Assn.* v. *Campbell*, 13 App. Cas. (D. C.) 581, (43 L. R. A. 622, 628, 629); 3 Pomeroy's Eq. (4 ed.), § 1280; *Barnes* v. *Thuet* 116 Iowa, 359 (89 N. W. 1085).

This court is committed to the doctrine announced in the above authorities, as shown by the opinion of Mr. Justice McBride, in *Pankey* v. *Oregon-California & East Ry. Co.*, 122 Or. 346 (255 Pac. 470, 471). The same principles have been applied under various states of fact in numerous cases: *In re Berry*, 147 Fed. 208, 210, 211; *Bank of Williston* v. *Alderman*, 106 S. C. 386 (91 S. E. 296, 297, 298); *Stern* v. *Wing*, 135 Mich. 331 (97 N. W. 791); *Page County* v. *Rose*, 130 Iowa,

296 (106 N. W. 744, 8 Ann. Cas. 114, 5 L. R. A. (N. S.) 886, 890).

The "estimate" to which the respondent consented to the assignment to the bank is defined in the testimony of Mr. Eddy, civil engineer, who was a witness for respondent in this suit, as meaning, in contracting parlance, the amount that the contractor is entitled to under his contract at a time stated. That is the meaning attached to the word when found in a contract, "as monthly estimate for the contractor."

The testimony defining the word of technical significance is entitled to consideration by the court: *Yreka Co.* v. *Lystul-Stuveland Lumber Co.*, 99 Or. 291 (195 Pac. 378); *Stanfield* v. *Arnwine*, 102 Or. 289, 298 (202 Pac. 559). The bank was entitled, under the arrangement made with the contractors and the surety company, to the amounts that were due or to become due, on the estimates, up to the time the contractors abandoned the contract.

If this were a case involving the rights of the surety company as against the contractors, it would be very simple. The surety company would have had the undoubted right when the contractors abandoned the work to step into their shoes and receive the benefit of all that was coming to the contractors thereafter on account of the work. However, the surety company, having agreed to the assignment of the amount of the estimates before that time, neither the contractors nor their surety had a right to the reserved percentages which had been earned prior to the default, as the same had been assigned by the contractors to the bank theretofore with the assent of the surety company.

■ The respondent contends that, under the indemnity agreement between the contractors and this respondent, the latter was subrogated to all of the rights and demands of the contractors against the government and that the surety thereby obtained an interest in the estimates and retained percentages prior to any claim of the bank or other general grantor.

As authority for this proposition the defendant cites, among other authorities, Brandt on Suretyship, Volume 1 (3 ed.), page 611, Section 324, which reads in part, as follows:

"By subrogation, in this connection, is meant the equitable principle upon which one who pays the debt, or satisfies the obligation of another under such circumstances that the other ought, as a man of honor and conscience, to repay his benefactor, is, for the purpose of giving him a chance to make himself whole, put in the place of the creditor or obligee to whom he has made payment, and given all securities and all rights and remedies against any person whatever that the creditor or obligee has to secure performance of the obligation,—so far as that can be done without violating the rights of innocent third parties."

We have already noted that at the time of the default, or thereafter, when the surety company had completed the work, the contractors had no right to the fund in question. Furthermore, the rule of subrogation is applied as far as it "can be done without violating the rights of innocent third parties." The bank, under the circumstances of this case, stands in the position of an innocent third party and the rule contended for by the defendant cannot be applied without violating its rights. The case of the *County of Wasco* v. *New England Eq. Ins. Co.*, 88 Or.

465 (172 Pac. 126, Ann. Cas. 1918E, 656, L. R. A. 1918D, 732), also cited by respondent as authority for the above proposition, is a case which well illustrates the rights of surety companies. In that case money due on a contract, but retained by a county until completion and acceptance of work, was by written order assigned by the contractor to a bank in consideration of money loaned the contractor and used by him to pay for labor and material for which he was bound by his contract to pay. The contractors' bond, as required by law, obliged the surety to pay for labor and material and also to complete the work.

The contract also provided for retention of money assigned until completion and acceptance of the work. It was held that on the contractor's default, until claims for labor and material were paid, the county's right to the fund assigned was superior to that of the assignee bank, and when the contractor's surety paid for labor and material as required, it was entitled to be subrogated as against the bank to the rights of the county, as of date of its contract, and hence the surety's right to the fund was superior to the assignment to the bank, which was bound to know when it voluntarily loaned its money of the surety's equity in the funds reserved.

In that case the surety had nothing to do with and did not consent to the assignment to the bank. In the present case the surety company assented in the plainest manner possible to an assignment to the plaintiff bank, which widely differentiates the two cases. The cases of *Derby* v. *United States Fidelity & G. Co.*, 87 Or. 34 (169 Pac. 500), cited by respondent, is on the same footing as the Wasco County case. See, also, *Ashley & Rumelin* v. *City of Portland*, 90

Or. 40 (175 Pac. 447); *Ausplund* v. *Aetna Ind. Co.*, 47 Or. 10, 20 (81 Pac. 577, 82 Pac. 12).

■ The letters referred to were given by respondent in favor of plaintiff and they are therefore to be construed favorably to plaintiff: *Salem Kings Prod. Co.* v. *Ramp*, 100 Or. 329, 355 (196 Pac. 401). The letters were in the nature of letters of credit and should be fairly construed to effectuate the intention of the parties: *Marshall-Wells* v. *Tenney*, 118 Or. 373, 383 (244 Pac. 84, 45 A. L. R. 1382).

The fund earned by the contractors is subject to a lien in favor of plaintiff to the extent of the indebtedness incurred by the contractors for advances made to them by plaintiff.

■ In 21 C. J., page 1204, Section 205, we find the following:

"Where a person has acted or refrained from acting in a particular manner upon the request or advice of another, the latter is estopped to take any position inconsistent with his own request or advice, to the prejudice of the person so induced to act."

See *C. A. Babcock* v. *Katz*, 121 Or. 64 (253 Pac. 373); *Snell* v. *Baker Bank*, 29 Or. 250, 253 (45 Pac. 783); *Sharkey* v. *Candiani*, 48 Or. 112, 126 (85 Pac. 219, 7 L. R. A. (N. S.) 791); *Ashley* v. *Pick*, 53 Or. 410, 417 (100 Pac. 1103); *Grand Prize Hyd. Mines* v. *Boswell*, 83 Or. 1, 12, 14 (151 Pac. 368, 162 Pac. 1063).

For the purpose of effecting justice under facts similar to those in the present case, courts have frequently imposed an equitable lien upon funds or property: 10 R. C. L. 351; 17 R. C. L. 604, 605.

*Walker* v. *Brown*, 165 U. S. 654, 663, 664 (41 L. Ed. 865, 870, 871, 17 Sup. Ct. Rep. 453), was a suit in equity brought by Walker & Company for the pur-

pose of charging an equitable lien on bonds held by Mrs. Brown as a gift from Brown, who had loaned $15,000 of bonds to J. C. Lloyd for the use of Lloyd & Company. In a letter to Walker & Company, Brown advised them that the loan "is with the understanding that any indebtedness that they may be owing to you at any time shall be paid before the return to me of these bonds, or the value thereof, and these bonds, or the value thereof, are at the risk of the business of Lloyd & Company, so far as any claim you may have against said Lloyd & Company is concerned." In reliance upon this letter Walker & Company extended payment on a small debt of Lloyd & Company and made further advances in goods so that the unpaid indebtedness of Lloyd & Company to Walker & Company amounted to $13,916.39, when Lloyd & Company became insolvent. The bonds were afterward returned to Brown and given to Mrs. Brown. It was held that the agreement embodied in the letter created an equitable lien in favor of Walker & Company upon the bonds; that the bonds which had been returned by Lloyd & Company to Brown were subject to an equitable charge for the payment of Walker & Company's debt. See *Hawes & Co.* v. *Trigg Co.,* 110 Va. 165 (65 S. E. 538, 542), where the court quotes from the opinion in the case of *Tatum* v. *Ballard,* 94 Va. 370 (26 S. E. 871), as follows:

" 'Words which show an intention of transferring or appropriating a chose in action to or for the use of another, if based upon a valuable consideration, will, in contemplation of a court of equity operate as an assignment.' "

In that case it appears that a power of attorney had been executed by the Trigg Company authorizing

the bank to collect all payments under its contract with the government for the construction of revenue cutters, on the faith of which the bank made loans to the Trigg Company. It was held that transaction constituted an assignment to the bank which was not defeated or invalidated by reason of the provision of Section 3477 of the Revised Statutes of the United States. See, also, *York* v. *Conde*, 147 N. Y. 486 (42 N. E. 193).

■ Respondent contends that the United States statute forbids the assignment of the funds due a contractor on public work, and that, therefore, it was not competent for these contractors or their surety to assign this fund to plaintiff. The equitable assignment on which plaintiff relies is, therefore, alleged to be unlawful and void.

The arrangement made with the plaintiff to advance the money was a tri-party agreement and respondent was a party thereto; moreover, respondent secured the fund which is the subject matter of this litigation on an order executed by the defendant Padrick. It relies on the same order as its authority for indorsing the check which included the fund of $6,533.83, which plaintiff contends is its property. Respondent is in no position to question the title of appellant to this fund, claimed by plaintiff under a similar instrument. The United States statute has been construed by the courts. The statute was passed for the protection of the government and it will not be permitted to defeat the rights of a private litigant whose controversy is not with the government, but with another claimant of the fund: *Jennings* v. *Whitney*, 224 Mass. 138 (112 N. E. 655); *Lay* v. *Lay*, 118 Miss. 549 (79 South. 291, 293); *Goodman* v. *Niblack*, 102 U. S. 556 (26 L. Ed. 229); *York* v.

*Conde,* 168 U. S. 642 (42 L. Ed. 611, 18 Sup. Ct. Rep. 234).

■ It is contended by respondent that the present suit is barred by the decree passed May 5, 1926, in the federal court in a former action brought by appellant against respondent, and shows the settlement of the action, "as amended by interlineation."

At the time of the action in the federal court the reserve percentages had not been paid to respondent and the present claims of plaintiff were not barred thereby. The amendment made to the bill in the federal court confined the controversy in the former suit to the money received by respondent on the July, 1924, estimate: *La Follett* v. *Mitchell,* 42 Or. 465, 471, 472 (69 Pac. 916, 95 Am. St. Rep. 780); *Stillwell* v. *Hill,* 87 Or. 112, 116, 117 (169 Pac. 1174). The decree in the former case therefore, is conclusive only as to the $5,147.74 received by the surety company on the July estimate.

■ Respondent submits that by reason of the default of the contractors they never became entitled to the percentages retained by the government. Respondent's brief states "the letters consent to the payment to the bank of all moneys *due or to become due* the contractors," and as the contractor defaulted and as respondent completed the contract at a loss, the bank is not entitled to the reserved percentages.

The work for which the 10 per cent was finally to be paid had been performed when the default was made. The contractors would not be entitled to the payment withheld for the reason that they had assigned such right to the bank.

We must, in order to arrive at the equities of the case, consider the matter as it stood when the so-called tri-party arrangement was made to which the

surety consented. If the work had been completed at a cost of one half of the amount of the contract price unpaid at the time of the default, the bank would have had no stronger claim than it has as matters now stand. In other words, at the time the surety company induced the bank to loan the money to the contractors and made the agreement which was for its interest the surety company took upon itself the risk of taking over the contract at a later date, which was no doubt delayed by virtue of the arrangement made with the bank, and at a time when it had by its own voluntary act released its right to the reserved percentages. The right of the government is not involved herein.

It is contended on behalf of respondent that it did not release its right to the fund in question for the reason it did not use the word "waive" in its letter. We fail to see how the language employed in the agreement can make a material difference if the understanding and arrangement is plainly expressed by the words used, and the rights and equities of the parties are clearly delineated in the carefully considered and integrated memoranda.

We recognize that it was unfortunate that the undertaking of the company turned out unprofitably in the end. Under the arrangement made for financing the contractors, when the bank paid the money to the contractors to enable them to carry on the work, it performed its part of the plan. It was not incumbent on the bank to see that the money was expended on the road. This would have been practically impossible. However, plaintiff offered to show that all of the money advanced was actually used in the road work. This was rejected on objection of respondent, and we think properly. The

monthly estimates were ordered paid to the bank with the surety's assent, as security for the loans made at different dates to Payne & Padrick. When a monthly estimate was made and the amount then due thereon was paid, and the notes of Payne & Padrick taken by the bank then in existence were satisfied, it was proper for the bank to credit the balance, if any, to the account of the contractors. There appears to have been no dissent to this from the surety at any time. The surety cannot now successfully claim that such procedure was a misapplication of monthly payments. The limit of $25,000 at any one time, mentioned in the letter, as well as the terms of the construction contract, indicate that the contractors were entitled to 90 per cent of the monthly estimates, and it appears to have been the plan that the bank and the contractors would square up, if possible, when the monthly estimates were made. In other words, the bank had no right to retain a portion of the 90 per cent of any monthly estimate as security for future advances not then made. The surety company, under any circumstances, was entitled to have held back only 10 per cent of the estimates. The contractors were entitled to all except this reserved percentage, and if the bank paid it to them, or for their account, it was all according to the original contract.

The equities are with the plaintiff. The decree of the trial court will be reversed and one entered in favor of plaintiff, that the United States Fidelity & Guaranty Company be declared to be the trustee for plaintiff, as to $6,533.84 of the draft, for and containing the reserved percentages mentioned by the United States government in favor of Payne & Padrick, and that respondent be required to pay said

amount to plaintiff, together with interest thereon at the rate of 6 per cent per annum from the 14th of October, 1925, the date of the receipt of said draft by respondent as prayed for in plaintiff's complaint.

REVERSED.

RAND, C. J., and BROWN and BELT, JJ., concur.