Argued March 26; affirmed June 16, 1931.

# OREGON SURETY & CASUALTY CO. *v.*
# UNITED STATES NATIONAL BANK OF EUGENE

(300 P. 336)

*S. J. Bischoff*, of Portland (Wilbur, Beckett, Howell & Oppenheimer, of Portland, on the brief), for appellant.

*Lawrence T. Harris*, of Eugene (C. A. Hardy and S. M. Calkins, both of Eugene, on the brief), for respondent.

ROSSMAN, J. No question of pleading being involved, we shall proceed forthwith to state those facts which reveal the issues between the parties.

March 26, 1925, one George W. Read and the State Highway Commission executed a contract wherein the former undertook the construction of a section of the Pacific highway, and the latter promised to pay him therefor $105,207.25. Pursuant to the requirements of §§ 49-701 and 67-1101, Oregon Code 1930, Read supplied a bond in the sum of $52,603.62, containing covenants upon the part of the surety (this plaintiff) that Read

"shall promptly pay all laborers, mechanics, subcontractors and material men, and all persons who shall

supply such laborers, mechanics or subcontractors with material, supplies or provisions for carrying on such work, and all just debts, dues and demands incurred in the performance of such work   *  *  *."

Simultaneous with the execution of the bond, Read and his wife executed an instrument wherein they promised to pay to the plaintiff an annual premium of $1,578.10 on said bond, to save the plaintiff harmless against all loss, to transfer to it, as security, all of Read's plant, materials, equipment, etc., and agreed that

"the said Oregon Surety & Casualty Co., shall, as surety on said bond, be subrogated to all my rights, *  *  * as principal and otherwise in said contract, and I do hereby assign, *  *  * to said company all the deferred payments, and retained percentages, and any and all moneys and properties that may be due and payable to me  *  *  * on account of said contract,  *  *  * hereby agreeing that all such moneys *  *  * shall be the sole property of the said Oregon Surety & Casualty Co., and to be by it credited upon any  *  *  * expense sustained or incurred by it as above under its bond of suretyship."

Having undertaken these obligations, Read requested a loan from the defendant which it agreed to grant, provided he would assign to it as security the sums payable to him by the Highway Commission, pursuant to the terms of his contract. In order to render the contemplated assignment effective, the plaintiff, on April 6, 1925, wrote, signed and forwarded to defendant the following letter:

"United States National Bank,
Eugene, Oregon,
Gentlemen:

Mr. George W. Read, who has the contract for paving the section of Pacific highway between Junction City and Harrisburg, has requested that we write to

you our consent to his making assignment of amount accruing to him from the State Highway Commission on this work, said assignment to cover any advances made by you to him on this job. This letter will serve as our formal consent to these assignments.

Very truly yours,
Oregon Surety & Casualty Co."

May 13, 1925, Read signed the following assignment:

"Eugene, Oregon, May 13, 1925.

I hereby transfer, assign, sell and set over unto the United States National Bank of Eugene, Oregon, all payments due me under that certain contract with the State Highway Commission of Oregon, for the construction and pavement with concrete of that certain four and two-tenths miles connecting Junction City with the paving at Harrisburg, and I hereby direct and authorize the State Highway Commission of Oregon to make all warrants and all payments to the United States National Bank of Eugene, Oregon, on said contract and on all estimates as the same shall be made. The contract is numbered 785 and   *   *   *"

When the above mentioned instrument of assignment, together with the plaintiff's assent thereto, was sent to the office of the Highway Commission it expressed its approval thereof, May 16, 1925, by endorsing thereon, over the signature of its chief clerk, the following: "We hereby assent to the above assignment."

Based upon the security of the aforementioned assigned moneys, the defendant bank advanced to Read on August 10, 1925, $1,075; August 22, 1925, $4,000; October 8, 1925, $8,000; October 27, 1925, $3,000; and on November 9, 1925, $2,000.

October 20, 1925, after Read had completed the performance of his contract, the state highway engineer

made his final estimate showing a balance of $15,250.07 due to him. In the early part of November, 1925, Read disappeared leaving unpaid bills for materials aggregating $14,299.26, and also owing to the defendant $14,467.20 upon the above mentioned notes. When this circumstance developed, the bank requested the Highway Commission to honor Read's assignment by paying to it the aforementioned balance in the commission's possession. The fact that Read had absconded, leaving unpaid large sums of money, had been promptly called to the attention of the surety and of the Highway Commission. December 1, 1925, the latter addressed to the plaintiff a letter stating:

"Please be advised that it is the intention of the State Highway Commission to make final payment to George W. Read on contract No. 785 for the construction of the Harrisburg–Junction City section of the Pacific highway in Linn and Lane counties. This payment will be made on or after December 11th, 1925. Kindly acknowledge receipt of this letter."

December 3, 1925, the plaintiff, through its attorneys, acknowledged receipt of this letter in a communication which stated:

"On behalf of the Oregon Surety & Casualty Company we demand that you do not pay the final sum or any sum to George W. Read for the following reasons:

"First—He is an absconding debtor and owes an enormous sum of money, and

"Second—A petition in bankruptcy has been filed against the said Read and no doubt he will be adjudicited a bankrupt in a few days.

"If this money is paid to him it will no doubt go like the other amounts have, that is, his creditors will not receive a bit of it."

December 4, 1925, the commission acknowledged receipt of the letter just mentioned and added:

"We will honor your demand and will withhold payment of further moneys due Mr. Read until the matter has been further adjusted."

Following the exchange of the above communications the attorneys representing the commission, the plaintiff, and the defendant held several conferences. December 9, 1925, Mr. J. M. Devers, the attorney for the commission, sent to counsel for the surety company the following letter:

"I have before me your letter of the 3d concerning the balance due George W. Read for work performed under his contract with the state of Oregon, and I note your instructions that no funds be paid to Mr. Read.

"The records in this office disclose that Mr. Read, more than four months ago, assigned to the United States National Bank of Eugene, Oregon, all of the money or funds due, or to become due, under and by virtue of his said contract with the state. The records further disclose that that assignment was consented to by the surety company.

"In view of these facts I take it that the Highway Commission is at liberty to pay the balance due under the contract to the assignee, which is the U. S. National Bank of Eugene, Oregon.

"The bank has filed its claim with the commission and has made its demand that the funds be paid to the bank as the assignee of Mr. Read. I know of no reason why the commission should not comply with the demand. If the surety company has any valid objection to such procedure it should make the same known at once."

Neither the plaintiff nor its attorney made any written reply to the latter letter, but Mr. F. C. Howell, its attorney, testified that he told the defendant's counsel that the plaintiff would oppose payment. In the

meantime, the bank forwarded to the commission, under the verified signature of Read, documentary proof that $15,250.07 was the correct balance remaining unpaid under the contract. This proof contained no statement that Read had paid all claims arising out of the performance of his contract. December 23, 1925, the commission delivered to the defendant its warrant in the sum of $15,250.07 and, since this payment exceeded to the extent of $812.87 the amount owing to the bank, the latter paid this excess sum to the trustee in bankruptcy of Read. The latter was adjudged a bankrupt January 16, 1926.

Since the defendant freely concedes that the sums loaned by it to Read were commingled by him with his other funds, and since it likewise admits that it cannot prove that all of the borrowed money was consumed by Read in the performance of this contract, the plaintiff contends that the defendant was not entitled to receive the above payment of $15,250.07.

While Read was performing his contract with the Highway Commission he was also engaged in the performance of some work for the city of Eugene. He deposited in the defendant bank, October 20, 1925, $8,271.38, and on November 10, 1925, $29,349.62, proceeds from municipal warrants. Various sums, however, were withdrawn by him in the transaction of his business to such an extent that on November 16, when the bank received its first intimation that he had been guilty of irregular transactions, his account contained a balance of only $1,000, which it applied upon Read's notes and thereby closed his checking account.

The plaintiff contends that the foregoing facts entitle it to recover $14,299.26, the amount of Read's unpaid bills at the time he absconded, and which it subsequently paid. It argues (1) that its consent to Read's

assignment to the defendant was upon the condition that any advances made by the defendant to him must be used in the performance of the contract; (2) that when the commission delivered to the defendant the sum of $15,250.07 payment was not yet due, owing to the fact that the proof in support of the claim did not contain any statement under oath that all accounts incurred by Read in the performance of his contract for labor and material had been paid; (3) that after the bank made its loans to Read it came into possession of more than $40,000 of Read's money which exceeded the amount of his notes and which, according to plaintiff's contentions, the bank could have applied in satisfaction of the sums due to it; and (4) that as Read's surety the doctrine of subrogation is available to it, and entitles it to recover $14,299.26.

■■ It is freely conceded by the plaintiff that Read's assignment to the bank of the sums to become due upon his contract with the state was sufficient to pass title to those sums and justified the state in making payment to the defendant, provided plaintiff's expression of its consent to the assignment was an unconditional one. The bank seems to agree that if for any reason it cannot retain this money the doctrine of subrogation is available to the surety, and it is entitled to become substituted in place of Read in the assertion of all rights and remedies which would have been available to him had he sought collection of the money from the state. But for a valuable consideration a surety may forego its rights and permit a third party to receive from the debtor the money payable free from any liens and claims otherwise available to it: *Cole v. Reeves,* 135 Or. 98 (294 P. 1099), and *First Nat. Bk. v. United States F. & G. Co.,* 127 Or. 147 (271 P. 57). Thus, as is illustrated in the cases just cited, if a surety, in order to

induce a bank to lend money to the contractor, agrees that the state shall pay the sums earned by the contractor to the bank, and the contractor makes an appropriate assignment, the right of subrogation is no longer available to the surety and the bank becomes entitled to receive the money free from any interference of the surety.

■ The crucial question for decision, therefore, is whether the plaintiff's letter of April 6, 1925, expressed unconditionally an assent upon its part that the state should pay to the defendant all sums earned by Read, or whether the assent was accompanied with a condition which permitted payment to the defendant only in the event that Read expended the moneys obtained by him from the defendant in the payment of debts incurred in the construction of this section of the Pacific highway.

The plaintiff seems to believe that any conclusion holding that it unconditionally assented to Read's assignment of the sums to become payable must be predicated upon a belief that, April 6, it "frittered" away the right of subrogation to which it might otherwise have become entitled upon its involuntary discharge of the debts of Read. But it is apparent from an examination of the reports that surety companies not infrequently waive their right of subrogation so that the contractor may obtain needed finances by assigning to the prospective lender the fruits of his contract; see for instance, *Cole v. Reeves,* supra; *First National Bk. v. United States F. & G. Co.,* supra; and 25 R. C. L. Subrogation, p. 1393, § 76. Moreover, it seems apparent that if the contractor is able to finance himself by obtaining needed funds from a responsible banking institution upon the security of his contract, which is frequently the only asset he possesses, this change in

his circumstances becomes beneficial to the surety because the contractor has thereby improved his chances of profitably performing his contract. In the present instance, Read was not a stranger to the surety nor to the bank. Extending over a priod of approximately three years he had established a good reputation with both institutions through his successful performance of several street improvement contracts with the city of Eugene. In all of these instances the plaintiff was surety upon his contracts of indemnity and the defendant had loaned to him money, taking as security assignments of the sums due from the city. It is our opinion that under these circumstances a holding that the surety on April 6, 1925, had consented unconditionally to an assignment of the sums earned by Read would not be tantamount to a conclusion that it had "frittered" away its right of subrogation.

■ The plaintiff's argument that its consent to the assignment was a conditional one is predicated upon a contention that the words "said assignment to cover any advances made by you to him on this job," found in its letter of April 6, expressed the condition. In ascertaining the meaning of this language we must bear in mind that Read, the surety, and the bank were practical persons who wrote letters not for the purpose of producing fine specimens of the lexicographer's art but for the purpose of transacting business. In the present instance the letter was written in compliance with a request that the surety declare the attitude which it was willing to assume in regard to an important course of action which Read had invited the bank to pursue. In such instances business men write their replies carefully, and if the attitude announced therein is one which is predicated upon a condition they prudently see to it that the condition is clearly

expressed. When a reading of the letter of April 6 is guided by these commonplace rules of interpretation which every one employs, we seriously doubt whether any ambiguity is to be found in it. It seems to us that the surety adopted the above quoted language as a means of saying "said assignment to cover any advances made by you to him on the security of this contract." And the rules of construction, employed by ·the law for the interpretation of an ambiguity, can be resorted to only when an ambiguity is contained in a document. But, since the plaintiff ardently contends that an ambiguity exists and that resort must be had to the rules of construction, we shall proceed.

██ It will be observed that in order to render plaintiff's proposed interpretation available it is necessary that words be added to the letter of April 6; thus the plaintiff's letter must be amended so as to make it read "said assignment to cover any advances made by you to him and consumed by Read in the performance of this job." It is at once obvious that the need for amending the letter of April 6 so as to make it convey the meaning urged by the surety is much more necessary than the need for amendment in order to develop the meaning suggested by the bank. Under these circumstances the rule of construction declared by § 9-220, Oregon Code 1930, is peculiarly applicable; it provides "when different constructions of a provision are otherwise equally proper, that is to be taken which is most favorable to the party in whose favor the provision was made." Obviously, the provision was made in favor of the bank. Moreover, since the surety was the author of the language which it declares contains an ambiguity, resort may properly be had to the rule of construction which resolves doubts against the author: *Salem King's Products Co. v. Ramp,* 100 Or. 329 (196 P. 401); 13

C. J. 545. This rule finds its support in the circumstance that the writer of the document generally has an opportunity of avoiding misunderstandings by using precise language. Likewise, no person should be permitted to hide away in ambiguous language a meaning favorable to himself and reveal it only after the recipient of his letter has been induced to contract with him, and the parties have become involved in litigation wherein the writer believes that resort to the hidden meaning will improve his chances.

■ These rules, however, are not to be applied with slavish devotion but in a manner that befits the reason upon which they are founded; hence, it is appropriate to consider the circumstances surrounding Read, the surety, and the bank with a view of determining how the surety in the exercise of common sense must have believed the bank would understand the meaning of its letter. As we have indicated before, the parties were not strangers to each other before this letter was written. Prior to April 6, 1925, the plaintiff had served as surety upon four contracts in which Read had bound himself to improve public streets in the city of Eugene. Read, in turn, had assigned to the defendant the sums payable in all of these contracts. Subsequent to April 6, but before the inception of this controversy, the plaintiff had become surety upon six more similar contracts. Shortly after Read had subscribed his signature to these several contracts he assigned to the defendant the sums payable by the city and thus supplied security which induced the bank to loan the funds that enabled him to perform his contracts; the instruments of assignment were filed by the bank in the office of the city recorder so as to supply notice to interested parties.

■ The plaintiff, upon at least one of the city contracts, manifested in writing its approval of the assignment to the defendant. There is no evidence indicating that the plaintiff ever inquired of Read or of the bank whether the latter was supervising his expenditure of the sums which it was loaning so as to confine Read's disbursements to the performance of the particular contract which had been pledged as security for the loan. As a matter of fact, Read had only one account with the defendant into which he deposited all of his funds and from which he made his withdrawals. It is apparent that the bank could not have supervised Read's expenditures to the extent of assuring itself that sums borrowed by him were actually being confined in their disbursement to some particular contract without incurring burdensome expense. The foregoing facts make it clear that when the surety company received at its Portland office a request for an expression in writing of its attitude toward Read's assignment the inquiry concerned a customer and a bank with whom it was familiar through several past experiences, and it is also evident that if the plaintiff desired the bank to supervise Read's expenditures its wishes could not be granted except by a type of service which is not generally rendered by banks. Moreover, since ample time was available to the plaintiff for the composition of its letter, and since neither Read nor any representative of the bank was present, no circumstances have been disclosed by the plaintiff which prevented it from couching its assent, and expressing any conditions thereto, in any language it chose to employ. These being the facts, we believe that the rules of construction previously stated are peculiarly applicable, and that they lend significance and cogency to the contention that we ought not hold the defendant's assent to the assign-

ment conditional in the absence of language in the letter of April 6 which reasonably indicates the reservation of a condition.

Another rule of construction which is available finds its fitness in the conduct of the parties after Read had disappeared and the bank had insisted that it was the assignee of the moneys in the possession of the Highway Commission. When the defendant obtained notice November 17, 1925, that Read had absconded its attorneys at once advised the plaintiff of that circumstance, and called its attention to the fact that the bank possessed "an assignment on what is known as the Junction City–Harrisburg job, contract No. 785, with the state, filed with the State Highway Commission, with your assent endorsed." November 16, an attorney representing one of Read's creditors wrote to the plaintiff demanding payment of his claim, and stating, "I am also informed that the U. S. National Bank of Eugene claims an assignment of the funds due on this work. I beg to advise you on behalf of C. G. McKy that we will look to the bond for payment. * * *." The plaintiff made reply in writing to neither of these letters, although, as will be observed, both of them mentioned the assignment and one of them plaintiff's assent thereto. Subsequent to the writing of these letters the Highway Commission, the plaintiff and the defendant exchanged some letters concerning payment of the balance due upon Read's contract. This correspondence extended beyond December 23, the date of payment, to January 21, when the firm of attorneys representing the plaintiff requested some information of Mr. S. M. Calkins, attorney for the bank. Their correspondence would readily lead anyone to believe that no dispute existed between the parties, and that they

were merely endeavoring to find some means of overcoming the obstacles created by Read's inability to swear that all debts created in the performance of his contract had been paid. In fact, the surety company's participation in this correcpondence was limited to two letters; in the one, the letter of December 3, 1925, previously quoted, it objected to payment being made to Read, and in the other, written January 20, 1926, it sought some information incidental to Read's bankruptcy. Even after the commission expressly declared its intention in its letter of December 9, also previously quoted, to make payment to the bank, and invited the surety company to manifest any objections it might have to such contemplated action, it wrote no letters whatever to the commission or to the bank. Indeed, it was not until March 3, 1926, and until the company had obtained a different attorney, that it stated in writing its present contention concerning a conditional consent.

Pursuing further our inquiry concerning the conduct of the parties so far as it shows a practical construction of the writing, we shall now determine whether the plaintiff and its attorneys ever orally stated that the surety company's assent to the assignment was conditional. Following the time of Read's disappearance to March 3, 1926, Mr. F. C. Howell, an attorney of very high standing, represented the plaintiff. He testified that shortly after receipt of the letter of November 17 he called at the office of Mr. Devers, also upon Mr. Calkins, and at the bank, informing all three that his client would not consent to payment to the bank. Mr. Devers, Mr. Calkins, and the officers of the bank with whom Mr. Howell conferred, agreed that he had visited their offices, but disputed substan-

tially all of the rest of his testimony. They testified that after Mr. Howell had been supplied with some information which he sought he agreed that the bank was entitled to payment, and negotiated with them concerning the disposition of the surplus and the form of the receipt. We deem it unnecessary to determine this conflict. The material point, in our opinion, is the almost total absence in Mr. Howell's testimony of any statement on his part that in the course of these various conferences he contended that the surety's assent to Read's assignment was accompanied with the condition which the plaintiff now urges. In the following excerpt, taken from Mr. Howell's testimony, wherein he related the circumstances of his conference with Mr. Devers, we find the only mention made by him in the entire course of his testimony of a condition attached to the assent:

"Q. Was there any discussion as to the legal effect of the consent which the surety company had given at that time?

"A. It was discussed, yes.

"Q. And what, if anything, was said with respect thereto?

"A. Mr. Devers seemed to think that the consent was sufficient, and we doubted the same; I told him that we had made our objection to the payment of the funds upon that consent."

The only "objection" which the surety or its attorneys had previously made is contained in the letter of December 3; it makes no mention of a conditional assent. Although Mr. Howell testified that he subsequently conferred with Mr. Calkins and with the president of the bank, he nowhere testified that in the course of these conferences he stated that there existed a limita-

tion upon the surety's consent to Read's assignment. Apparently the only reason which Mr. Howell was urging at that time against payment was based upon a supposed insufficiency in the final proof submitted by the bank, although several of his replies were, "I stated at that time that we had made our objections to the payment to them and would stand upon our rights in the matter." He did not specify the "rights" suggested by his above answers unless they are disclosed by his following language: "We discussed the matter in a lawyer-like way. There is many very interesting questions in it relative to the law of sureties, contracts for public work, and we discussed those matters at length." Mr. Howell freely conceded that the bank willingly supplied him with all the information he requested and gave him access to its files. Thus he was not proceeding ignorant of the facts. As a witness he admitted that neither the plaintiff nor himself had made any reply to the Highway Commission's letter of December 9 which announced that it, knowing of no reason for not recognizing the bank's claim, intended to make payment unless the surety company voiced objection. When Mr. Howell's attention was called to this letter he testified that he discussed it with Calkins, and added: "I told Mr. Calkins at that time and place distinctly that we might have to recognize their claim later, but would not do it at that time." In this same period of time, while Mr. Howell was at Eugene conferring with Mr. Calkins, he drew drafts upon the plaintiff for payment of some laborers' claims. His acts in so doing seem to indicate that he did not believe that the funds in the possession of the commission were available for that purpose. It will thus be observed that in the interval of approximately a month following Read's disappearance, while the surety, the bank, and

the commission were endeavoring to come to an understanding, the plaintiff not once asserted that its assent was a conditional one, unless Mr. Howell's statement to Mr. Devers that he (referring to the surety's consent) "doubted the same" thereby asserted the condition. We believe that the above conduct, extending over a period of more than a month, strongly indicates that all three parties construed the letter of April 6 as constituting an unconditional consent to Read's assignment to the bank of the prospective payments.

The above rules of construction, we believe, are the controlling ones. The plaintiff's brief emphasizes the rule of reasonable construction which seeks the purpose of the contracting parties, and endeavors to avoid unreasonable, unfair and unjust interpretation. We have not overlooked this rule, but have sought to employ it. To endeavor to read into the letter of April 6 a requirement that the bank must supervise Read's expenditures, when it is extremely doubtful whether the letter contains even an ambiguous word, would be, in our opinion, an unjust and unfair result. We have also kept in sight the fact that should we conclude that the surety company surrendered its right of subrogation it parted with a privilege of great value. But, after considering all of the evidence and being guided by the above rules of construction, we are firmly convinced that plaintiff's assent to the assignment was general and not conditional. Other facts disclosed by the evidence are possibly worthy of mention, but since they all support the conclusion just stated we shall omit mention of them. Our decision finds some support in the effect yielded to like words of assignment and of assent which are quoted and construed in *First Nat.*

*Bk. v. United States F. & G. Co.,* supra, and *Cole v. Reeves,* supra. In the first of these cases Mr. Justice BEAN, on behalf of this court, declared:

"Under the arrangement made for financing the contractors, when the bank paid the money to the contractors to enable them to carry on the work, it performed its part of the plan. It was not incumbent on the bank to see that the money was expended on the road. This would have been practically impossible."

■ There remains for decision the issue whether the commission's payment was premature. Plaintiff contends that no payment could be made until sworn proof had been supplied to the state establishing the fact that all debts incurred in the performance of the contract had been discharged: § 49-701, subd. 7 of § 67-212, and 67-1101, Oregon Code 1930, upon which the plaintiff in part relies, do not in our opinion contemplate such proof. Subdivision 7 of § 67-212 requires the secretary of state to exact from the claimant a statement of his account, verified by his oath or by that of his authorized representative. Such proof was submitted. The general purpose of statutes, like §§ 49-701 and 67-1101, which require contractors who are engaged in the construction of public improvements to furnish a bond for the protection of laborers and material men, is to supply a substitute for the statutory lien which would be available had the property been privately owned: *State v. Johnson Contract Co.,* 120 Or. 633 (253 P. 520) ; and *Chouteau Trust Co. v. Massachusetts Bonding & Ins. Co.,* 1 Fed. (2d) 136. In addition § 67-1101 contains a provision which authorizes the commission to pay laborers and material men their charges upon the default of the contractor and to make a charge against the contractor, but this provision is for the protection of the state: *First Nat. Bk. v. United*

*States F. & G. Co.,* supra. We find nothing in these two statutes which postpones final payment to the contractor until he supplies sworn proof that all debts incurred in the prosecution of the work have been paid. The contract contains this provision:

"No partial payment shall be made as long as any order made by the engineer to the contractor in compliance with these specifications shall remain uncomplied with, nor any partial or final payment be made as long as any claim or lien filed or prosecuted against the state of Oregon, the State Highway Commission, or the officers thereof, in conflict with the provisions of this contract, shall remain unsatisfied."

None of the conditions mentioned above having occurred when request for final payment was made, these stipulations of the contract can avail the plaintiff nothing.

Having concluded that the assignment and plaintiff's assent thereto were unconditional, it is unnecessary to consider the contentions that defendant's possession at times of enough of Read's money to discharge his indebtedness to it renders its possession at this time of the disputed sum unjust. It is likewise unnecessary for us to determine the various contentions in regard to plaintiff's alleged right of subrogation for the reasons already stated. Appellant's brief argues an objection presented upon the offer of an item of evidence. We have carefully considered this assignment of error but believe it reveals no merit.

It follows that the decree of the circuit court will be affirmed.

BEAN, C. J., RAND and KELLY, JJ., concur.